IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 96-30202

JAMES J LICCIARDI; AGATHA LICCIARDI SPERA;
MARY ANN DISALVO LICCIARDI, wife of James J. Licciardi;
MARY ANN LICCIARDI NAVO, wife of and; BENJAMIN NAVO,

Plaintiffs-Appellants-Cross-Appellees,

v.

MURPHY OIL USA INC.,

Defendant-Appellee-Cross-Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

April 21, 1997

Before HIGGINBOTHAM, SMITH, and BARKSDALE, Circuit Judges.

PER CURIAM:

I

From 1991 through 1993, the Licciardis hired a number of environmental testing and consulting firms to take and test environmental samples from their property located adjacent to Murphy Oil's Meraux refinery in Louisiana. Armed with results of these tests, the Licciardis filed suit under § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9607, alleging that the samples demonstrate that Murphy contaminated their property with leaded tank bottoms and refinery sludge in violation of environmental law.[1]

---

[1] The Licciardis also made certain state law claims in their complaint. The district court was unable to find sufficient support for these state-law lost profit claims, and decided that portion of the case for Murphy. The Licciardis have not appealed, so we do not revisit that decision here.

The bench trial was bifurcated into liability and damages phases. Following the liability phase, the district court entered its findings. The court found that a certain "black tarry substance" from a sample taken from the Licciardis' property came from Murphy's refinery, finding that the level of lead concentration in the soil at the testing site exceeded background levels. The court held that defendant's release of the substance caused plaintiffs' response costs. The district court observed that the "presence of any hazardous substances [above background levels] on plaintiffs' property is sufficient to justify their incurring response costs." After ordering briefs from the parties on damages, the trial court awarded the Licciardis $12,337, the amount which Murphy stipulated to as the Licciardis' expense for testing for substances defined as "hazardous" under CERCLA. Both sides appeal. Murphy contests any finding of liability while the Licciardis assert that all of their expenses on sampling and testing should have been awarded as damages.

II

There are four elements to a CERCLA cost-recovery action, such as the one here: (1) the site must be a "facility" under § 9609(9); (2) the defendant must be a "responsible person" under § 9607(a); (3) a release or threatened release of a hazardous substance must have occurred; and (4) the release or threatened release must have caused the plaintiff to incur response costs. *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989). The first and second of these elements are not in issue here. Murphy is a "responsible person" and its refinery is a "facility." The district court correctly noted that lead is a "hazardous substance" under 40 C.F.R. § 302.4.

In *Amoco*, we rejected the proposition that CERCLA "liability attaches upon release of *any* quantity of a hazardous substance." 889 F.2d at 670 (emphasis original). We explained that the question of whether a release has "caused" or justified response costs is tempered by the purpose of the Act. *Id.* Although we acknowledged that it is "not the exclusive means of justifying response costs, [ ] a plaintiff who has incurred response costs meets the liability requirement as a matter of law if it is shown that *any* release violates . . . *any* applicable state or federal standard, including the most

2

stringent." *Id.* at 671 (emphasis original). However, the district court's reliance upon a violation of a standard and *Amoco* was misplaced, as we will explain.

The district court concluded that any lead found in the sample "exceeding background levels" constituted a release that caused the Licciardis' response costs under CERCLA if the lead came from Murphy's refinery. Although the district court did not specify, the record reflects that its reference to "background levels" refers to the 1984 U.S. Geological Survey.

The U.S. Geological Survey measures empirical evidence relating certain topological and geological facts for a point on the globe. It is not a legal standard. We are aware of no environmental law, state or federal, that establishes the U.S. Geological Survey "background level" as a standard, requirement, or criterion. Relatedly, it is not clear that the Survey figure used by the district court was relevant; according to an expert who testified at trial, the "background level" relied upon by the district court was established "30 to 50 miles away from the Meraux refinery."

The trial court also considered the drinking water standard and the toxic concentration leaching procedure (or "TCLP") standard. According to plaintiffs' expert, the drinking water standard establishes a legally acceptable limit for lead "at the tap," but none of the experts at trial attempted to link the standard to groundwater tests. Moreover, plaintiffs' expert admitted at trial that she had not carried out any groundwater testing, and that there was insufficient data to form any opinion that the Licciardis' property had been affected by groundwater migration from the refinery. As for the TCLP standard, plaintiffs' expert explained that even if a material contains lead, EPA does not consider it "hazardous" unless the lead is capable of "leaching" out of the material. The TCLP standard, she explained, is an extraction procedure under which a scientist simulates a landfill environment with rainfall and acidity controls, then tests for lead in the resulting leachate. Plaintiffs admitted in their Supplemental Post-Trial Memorandum that the "TCLP analysis was below regulatory levels." Thus, even though they have expended significant effort and resources testing their property and hiring experts, plaintiffs have been unable to offer any evidence that any regulatory standard has been breached.

3

Without the Geological Survey, the drinking water standard, or the TCLP standard as possible bases for finding that Murphy's release caused response costs, we ask whether, in the absence of any other evidence, a finding of hazardous substance "above background levels" is sufficient to support a finding that the release caused response costs. As we explained in *Amoco*, responsible parties are not liable unless there is evidence that they "posed [a] threat to the public or the environment." While *Amoco* allows a CERCLA plaintiff to prove that response costs were caused by a release without resort to an applicable legal standard of justification, bare proof that there was a release is not enough; as we have explained, liability does not attach to the release of "*any* quantity of a hazardous substance." *Id.* at 670-71. "[T]he question of whether a release has caused the incurrence of response costs should rest upon a factual inquiry into the circumstances of a case and the relevant factual inquiry should focus on whether the particular hazard justified any response actions." *Id.* at 670. We have been pointed to no evidence that the found "release" justified the response costs. We cannot sustain the district court's finding of liability.

We do not reach the issues regarding the proper calculation of damages under CERCLA. REVERSED.

4