KALAMAZOO RIVER STUDY
GROUP, Plaintiff,

v.

ROCKWELL INTERNATIONAL,
et al., Defendants.

No. 1:95–CV–838.

United States District Court,
W.D. Michigan,
Southern Division.

March 6, 1998.

Alan C. Bennett, Law, Weathers & Richardson, Grand Rapids, MI, Jerome T. Wolf, Sonnenschein Nath & Rosenthal, Kansas City, MO, for Kalamazoo River Study Group.

Kathryn J. Humphrey, Joseph C. Basta, Dykema Gossett, PLLC, Detroit, MI, for Rockwell Intern. Corp., Eaton Corp.

Thomas M. Weibel, Smith, Haughey, Rice & Roegge, PC, Grand Rapids, MI, for Hercules, Inc.

Jon R. Muth, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, Daniel P. Perk, Miller, Johnson, Snell & Cummiskey, PLC, Kalamazoo, MI, for Benteler Industries, Inc.

Jeffrey L. Woolstrum, Honigman, Miller, Schwartz & Cohn, Detroit, MI, Dustin P. Ordway, James Gavin O'Connor, Dickinson Wright, PLLC, Grand Rapids, MI, for Menasha Corp.

Douglas E. Wagner, Warner, Norcross & Judd, LLP, Grand Rapids, MI, for Upjohn Co.

Arthur H. Siegal, Jaffe, Raitt, Heuer & Weiss, PC, Detroit, MI, for Rock–Tenn Co., Mill Div., Inc.

## *OPINION*

ROBERT HOLMES BELL, District Judge.

This matter comes before the Court on cross-motions for summary judgment filed by Plaintiff Kalamazoo River Study Group ("KRSG"), and Defendants Menasha Corporation, Pharmacia and Upjohn Company ("Upjohn") and Rock–Tenn Company, Mill Division, Inc. ("Rock–Tenn").

## I. BACKGROUND

In June 1990, after nearly twenty years of investigating PCB contamination in the Kalamazoo River, the Michigan Department of Natural Resources (now the Michigan Department of Environmental Quality, "MDEQ") identified three paper mills—Allied Paper Company/HM Holdings, Inc. ("Allied"), Georgia Pacific Corporation ("Georgia Pacific") and Simpson Plainwell Paper Company ("Simpson")—as the principal sources of PCB contamination on a 35 mile stretch of the Kalamazoo River, a three-mile stretch of Portage Creek and certain operable units [1] (the "Site").

In August 1990, the Site was added to the National Priorities List pursuant to CERCLA. In December 1990, Allied, Georgia Pacific and Simpson entered into an Administrative Order by Consent ("AOC") requiring them to perform a remedial investigation/feasibility study ("RI/FS") at the Site. Subsequently, James River Company ("James River") voluntarily agreed to pay a portion of the costs of the RI/FS undertaken pursuant to the AOC. Allied, Georgia Pacific, Simpson and James River have formed an unincorporated association called the Kalamazoo River Study Group ("KRSG"). There is no dispute that KRSG members released PCBs to the Site and that each can be held liable under Section 107 of CERCLA, 42 U.S.C. § 9607. There is also no dispute that those PCBs have migrated downstream over time.

Polychlorinated Biphenyls, ("PCBs") were produced in the United States from the 1940's through the 1970's exclusively by Monsanto Industrial Chemicals Company ("Monsanto"), which marketed the compounds under the trade name "Aroclor." PCBs were most commonly used in electrical components such as capacitors and transformers, but they were also used in the paper industry. Between 1957 and 1971, a type of carbonless copy paper typically referred to as "NCR" paper, incorporated Aroclor 1242 as a solvent. According to the MDNR, the recycling of carbonless copy paper was a major source of the PCBs at the Site.

Many recycled paper mills may have had NCR paper in their feedstock. However, mills which practiced de-inking discharged PCBs in much greater quantities. De-inking is used to produce higher quality papers from recycled feedstock. Each of the mills owned by KRSG's members performed de-inking or used de-inked feedstock at some point in the past. Georgia Pacific and James River, at various times, used feedstock consisting entirely or largely of NCR paper. There are massive quantities of PCBs in the Site. Estimates range between 350,000 pounds to over 4 million pounds.[2]

In December 1995 KRSG filed this action against eight corporations,[3] alleging that they contributed to the PCB contamination at the Site. KRSG seeks to recover its response costs under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. and the Michigan Natural Resources and Environmental Protection Act ("NREPA"), M.C.L.A. § 324.20101, et seq. and common

---

**1.** The operable units ("OU's") are the Allied Paper/Bryant Mill Pond, the Willow Boulevard/A–Site, the King Highway Landfill and the 12th Street Landfill. Each of the OU's was used for the disposal of papermaking residuals and has been identified as a potential source of continuing PCB releases to the Site.

**2.** Georgia Pacific's expert, Mr. Richard Valley, estimated that between 1960 and 1979, Plaintiff's members discharged between 2 million and 4 million pounds of PCBs. Valley estimated the minimum theoretical PCB discharges for each company as follows: Georgia Pacific, 560,000 pounds; Allied Paper, 895,000 pounds; Simpson–Plainwell, 254,000 pounds; and James River, 512,000 pounds. KRSG's expert, Blasland, Bouck & Lee, Inc., reported in its July 1992

Description of the Current Situation that a 1983 survey of PCBs in the Kalamazoo River indicated that the sediments in some portions of the Site (the area surrounding Bryant Mill Pond, the Plainwell, Otsego, and Trowbridge impoundments, and Lake Allegan) contained an estimated 227,910 pounds of PCBs. In March 1996, the EPA estimated that over 300,000 pounds of PCBs had been disposed of at the Site and that they were continuing to migrate downstream.

**3.** The defendants named in this action are Rockwell International, Eaton Corporation, Wells Aluminum Corporation, Hercules, Inc., Benteler Industries, Inc., Menasha Corporation, Pharmacia and Upjohn Company, and Rock–Tenn Company, Mill Division, Inc.,

law theories.[4]

Summary judgment was previously entered in favor of Benteler Industries. This Court has also entered partial summary judgment in favor of Defendants Rock–Tenn and Menasha, restricting Plaintiff's claim to one for contribution. This Court ruled that CERCLA does not permit a claim by one PRP against other PRPs for joint and several liability.

This matter is currently before the Court on cross-motions for summary judgment filed by Plaintiff and Defendants Menasha, Upjohn, and Rock–Tenn.

## II. ANALYSIS

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the movant carries its burden of showing there is an absence of evidence to support a claim then the non-moving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587. Nevertheless, the party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* at 586. The mere existence of a scintilla of evidence in support of the non-movant's posi-

tion is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. *See generally, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476–80 (6th Cir.1989).

The purpose of CERCLA is "to facilitate the prompt cleanup of hazardous waste sites by placing the ultimate financial responsibility for cleanup on those responsible for hazardous wastes." *United States v. R.W. Meyer*, 889 F.2d 1497, 1500 (6th Cir.1989).

In order to establish a prima facie case of CERCLA liability against any of the Defendants in this case, KRSG must establish that:

1. there was a release or threatened release of a hazardous substance;

2. the Site of the release or threatened release is a "facility" as defined in 42 U.S.C. § 9601(9);

3. the release or threatened release has caused the plaintiff to incur response costs; and

4. the defendant is an owner or operator of the facility from which there was a release, or is an arranger or transporter under CERCLA § 107(a).

42 U.S.C. § 9607(a). *See also ABB Indus. Sys. v. Prime Technology, Inc.*, 120 F.3d 351, 356 (2nd Cir.1997); *FMC Corp. v. Aero Indus., Inc.*, 998 F.2d 842, 845 (10th Cir.1993)(citing *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989)); *Plaskon Electronic Materials, Inc. v. Allied–Signal, Inc.*, 904 F.Supp. 644, 659 (N.D.Ohio 1995).

NREPA (formerly MERA) was patterned after CERCLA, and is construed in accordance with CERCLA. *Kelley v. Tiscornia*, 827 F.Supp. 1315, 1318 n. 1 (W.D.Mich. 1993); *Flanders Industries, Inc. v. Michi-*

---

4. KRSG's Amended Complaint includes the following theories of recovery: Count I, demand for reimbursement of response costs under CERCLA § 107(a); Count II, contribution under CERCLA §§ 113(f) and 107(a); Count III, declaratory judgment of CERCLA liability under CERCLA § 113(g)(2); Count IV, contribution under federal common law; Count V, recovery of response costs under NREPA § 20126 M.C.L. § 324.20126; Count VI, contribution under NREPA § 20129, M.C.L. 324.20129; Count VII, contribution under the Joint Tort–Feasors Act, M.C.L. § 600.2925a; and Count VIII, reimbursement for unjust enrichment.

*gan,* 203 Mich.App. 15, 21, 512 N.W.2d 328 (1993). Accordingly, for purposes of this motion the Court will assume that Plaintiff's claims under Part 201 of the NREPA, M.C.L.A. § 324.20101; M.S.A. § 13A.20101 *et seq.,* will stand or fall under the same analysis applied to the claims under CERCLA.

## A. *Causation*

■ There has been much debate in this case with respect to Plaintiff's burden of proof on the issue of "causation." The standard language in the case law is that the plaintiff must show that "the release" caused the plaintiff to incur response costs. *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 325 (7th Cir.1994); *FMC Corp. v. Aero Indus., Inc.,* 998 F.2d 842, 845 (10th Cir.1993); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir. 1989).

The Eighth Circuit has stated that "CERCLA focuses on whether the *defendant's* release or threatened release caused harm to the plaintiff in the form of response costs." (emphasis added). *Control Data Corp. v. S.C.S.C. Corp.,* 53 F.3d 930, 935 (8th Cir.1995).

Plaintiff contends that because CERCLA imposes strict liability, it need not prove causation at all. Plaintiff contends that all it needs to show is that the defendant discharged PCBs to the Site and that the KRSG incurred response costs as a result of *a release* of PCBs at the Site, from any source. *See United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 721 (2nd Cir.1993).[5] *See also B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (2nd Cir.1996)("Because CERCLA imposes strict liability, there is no causation requirement")(applying the *Alcan* standard to a contribution action between responsible parties);

*OHM Remediation Services v. Evans Cooperage Co.,* 116 F.3d 1574, 1578 (5th Cir.1997)("Because CERCLA imposes strict liability ... plaintiffs generally need not prove causation, only that the defendant is a 'covered person.' ").

■ Bound up with the causation issue is Plaintiff's contention that there is no requirement that a defendant discharge some minimum quantity of hazardous substances to the Site in order to be held liable. Plaintiff contends that "any trace" of a hazardous substance attributable to the defendant is sufficient to hold the defendant liable. *See Cose v. Getty Oil Co.,* 4 F.3d 700, 708–09 (9th Cir.1993)("Liability is imposed under CERCLA *regardless of* the concentration of the hazardous substances present in a defendant's waste, *as long as* the contaminants are listed 'hazardous substances' pursuant to 42 C.F.R. § 302.4(a)." (emphasis in original)); *United States v. New Castle County,* 769 F.Supp. 591, 594 (D.Del.1991)("There is no de minimis defense to liability under CERCLA. Therefore, the dispute over the amount of PVC deposited is irrelevant to the Court's analysis." (footnote omitted)).

This Court agrees that in a multi-generator context such as this, Plaintiff cannot be required to trace or fingerprint the waste from each PRP. The Court will not require the Plaintiff to prove that a particular defendant caused Plaintiff to incur response costs. On the other hand, this Court does not agree with Plaintiff's contention that a defendant's release of any quantity, even the slightest, of hazardous substances is enough to support a judgment against that defendant for an undetermined extent in a contribution action brought by an admittedly responsible party.

In *Farmland Industries v. Morrison–Quirk Grain Corp.,* 987 F.2d 1335 (8th Cir. 1993), the Eighth Circuit recognized that

---

**5.** The Second circuit outlined the government's burden of proof in a § 107(a) action as follows: [T]he government need only prove: (1) there was a release or threatened release, which (2) caused incurrence of response costs, and (3) that the defendant generated hazardous waste at the clean-up site. What is *not* required is that the government show that a specific defendant's waste caused incurrence of clean-up costs.

*Alcan,* 990 F.2d at 721. CERCLA "requires plaintiff to prove that the release or threatened release caused the incurrence of response costs, and that the defendant is a generator of hazardous substances at the facility." *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 264 (3rd Cir.1992).

there may be a different standard for a case brought by the government and a case brought by a private party. In *Farmland* the court stated that liability to the United States for CERCLA response costs is a matter of strict liability · and therefore is not dependent on any showing of causation or fault. *Id.* at 1339. The court observed, however, that a private party cannot predicate a claim for contribution solely upon § 9607 liability to the government, but must also prove causation. *Id.* at 1340.

 A number of courts have recognized a distinction between a cost recovery action brought by the government or other innocent party, and a contribution action brought by one PRP against another. As this Court noted in its opinion on the motions for partial summary judgment, an action for contribution under § 113(f) differs in material respects from a cost recovery action under § 107. · There is a difference in the applicable statute of limitations, and there is a difference in· whether liability will be several or joint. There is also a difference occasioned by the application of equitable contribution principles in § 113(f) actions. The contours of all CERCLA claims by and between PRPs who contributed waste to a site are governed by the equitable contribution principles of § 113(f). *Sun Co., Inc. (R & M) v. Browning–Ferris, Inc.,* 124 F.3d 1187, 1191 (10th Cir.1997). These equitable contribution principles permit the court to consider whether or to what degree the defendant caused the response costs in a § 113(f) contribution action.[6] *But see Premium Plastics v. LaSalle National Bank,* 904 F.Supp. 809, 815 (N.D.Ill.1995)("CERCLA in no way states or implies that private plaintiffs bear a heavier burden of proof than government plaintiffs.").

The Fifth Circuit has not based liability on the release of a minimum quantity of hazardous substances, but it has required a release sufficient to justify response costs.

[T]he question of whether a release has caused the ·incurrence of response costs should rest upon a factual inquiry into the circumstances of a case and the relevant factual inquiry should focus on whether the particular hazard *justified* any response actions.

*Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 670 (5th Cir.1989). (emphasis added).

In *Licciardi v. Murphy Oil U.S.A., Inc.,* 111 F.3d 396 (5th Cir.1997), where the plaintiffs had shown no breach of any regulatory standard, the finding. of hazardous sub-· stances "above background levels" was held to be insufficient to support a finding that the release caused response costs. "As we explained in *Amoco,* responsible parties are not liable unless there is evidence that they 'posed [a] threat to the public or the environment.'" *Licciardi,* 111 F.3d at 399. "While *Amoco* allows a CERCLA plaintiff to prove that response costs were caused by a release without resort to an applicable legal standard of justification, bare proof that there was a release is not enough." *Id.*

In *Acushnet Co. v. Coaters, Inc.* ("*Acushnet I*"), 937 F.Supp. 988 (D.Mass.1996), PRPs who entered into a consent decree with the EPA regarding a waste dump in New Bedford known as Sullivan's Ledge brought a contribution action against other nonsettling PRPs. The plaintiffs sought cost recovery from defendant New England Telephone & Telegraph Co. ("NETT") which had disposed of utility pole butts contaminated with PAHs (polycyclic aromatic hydrocarbons) at the site, even though the evidence showed that the pole butts would not leach PAHs to the site at levels above background levels. *Id.* at 990. The court *rejected* the contention that "*any* hazardous substance in *any* quantity will open the floodgates of liability, and will do so even if the hazardous substance disposed of by the party is not causing any harm, is not threatening to cause any harm, and is not any part of the reason a· response is needed and costs of the response are incurred." *Id.* at 993 (emphasis added). The

**6.** The Eighth Circuit raised the question of what *degree* of connection would be necessary to establish a causal nexus between the release and the incurrence of response costs in *Control Data,* 53 F.3d at 935 n. 8. The court was not required to

resolve this problem in *Control Data* because there was no question that the defendants' release directly caused the incurrence of response costs by the plaintiff.

court granted summary judgment to NETT because of the insufficiency of plaintiffs' proffered evidence to support a finding of a causal connection between the sparse quantity of allegedly hazardous substances traceable to NETT, and plaintiffs' incurring costs for which they sought contribution. *Id.* at 988.

In a second opinion regarding Sullivan's Ledge the court granted judgment as a matter of law to three more defendants based upon the insufficiency of the evidence, and developed what it described as the "threshold-of-significance standard" for application in contribution actions under § 117. *Acushnet Co. v. Coaters, Inc. ("Acushnet II"),* 948 F.Supp. 128, 134–38 (D.Mass.1996). *See also Acushnet Co. v. Coaters, Inc. (Acushnet III),* 972 F.Supp. 41, 49 (D.Mass.1997)("a settling party may claim reimbursement of a share of remediation costs against a non-settling party upon satisfaction of a threshold-of-significance standard").

According to the *Acushnet* court, § 117(f) [7] authorizes an equitable approach to determining liability in a contribution action:

> The "equitable factors" mandate is appropriately interpreted as at least authorizing, if not mandating for this case, making comparisons between plaintiffs in a contribution action and defendants whom they allege to be potentially responsible parties, by considering evidence before the court ... for the purpose of determining whether the nature and extent of their respective ties to the hazards to persons, property, and the environment make it fair and reasonable to order that a defendant ... reimburse the plaintiffs in some amount or some share of "contribution", allocated on an equitable basis reasoned from evidence concerning all the "equitable factors" for the application of which in this case some evidentiary basis exists.

*Acushnet II,* 948 F.Supp. at 135–36. According to the *Acushnet* court, plaintiffs must proffer evidence sufficient to support a finding that hazardous substances traceable to the defendant are in nature, quantity, and

durability sufficient to invoke an exception to the fundamental principle of the legal system that courts are to leave harms and losses where they find them unless some good reason appears for shifting a loss from one party to another party. *Id.* at 136. "In other words, plaintiffs must proffer sufficient evidence as to a particular defendant to satisfy a minimum standard of significance of that defendant's responsibility as a source of one or more hazardous substances deposited at the site." *Id.* This standard demands more than would a de minimis or scintilla standard. *Id.*

The Court is aware of no Sixth Circuit case law on the subject of causation under CERCLA. However, in *United States v. Cordova Chemical Co.,* 113 F.3d 572 (6th Cir.), *cert. granted,* — U.S. ——, 118 S.Ct. 621, 139 L.Ed.2d 506 (1997), the Sixth Circuit instructed as follows:

> Thus, while the liability provisions concerning facility operators should be construed so that financial responsibility for clean-up operations falls upon those entities that contributed to the environmental problem, the widest net possible ought not be cast in order to snare those who are either innocently or tangentially tied to the facility at issue. . . .
>
> . . . [W]e adhere to the tenet that liability attaches only to those parties who are culpable in the sense that they, by some realistic measure, helped create the harmful conditions.

*Id.* at 578.

This Court recognizes that in *Cordova* the Sixth Circuit was addressing the issue of whether a parent corporation could be held liable for the acts of its subsidiary, which contributed to the contamination at a particular site. The *Cordova* court was not concerned with the significance of a particular release. Nevertheless, this Court believes that the essence of the Sixth Circuit's statement in *Cordova* is applicable in this case as well. The Court's concern with culpability and "realistic measure" supports application

---

**7.** CERCLA § 113(f) provides in pertinent part:
 In resolving contribution claims, the court may allocate response costs among liable parties using such *equitable factors* as the court determines are appropriate.
 42 U.S.C. § 9613(f)(1)(emphasis added).

of a test in a contribution action that asks whether a particular defendant's responsibility was of sufficient significance to justify the response costs.

In reviewing the cross-motions for summary judgment, this Court will apply the threshold of significance standard: is the evidence of defendant's release of sufficient significance to justify holding defendant liable for response costs?

### B. *Third-Party Defense*

Plaintiff has asserted that Menasha, Pharmacia & Upjohn and Rock–Tenn are all liable for response costs simply on the basis that they own riparian land bordering on the Kalamazoo River, and PCBs have been found in sediments in the river bed adjacent to their properties.

The three defendants currently before this Court have all raised the third-party defense. CERCLA provides that persons who are responsible under § 107(a) may nevertheless escape liability if they can show that the release of the hazardous substance was caused solely by an act or omission of a third-party. 42 U.S.C. § 9607(b)(3). *See Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1507 (11th Cir.1996).

■ To establish a third-party defense the defendant must show:

1. that a third party was the sole cause of the release or threatened release of a hazardous substance;

2. that the act or omission of the third party causing the release did not occur in the context of a direct or indirect contractual relationship between the defendant and the third party; and

3. that the defendant took due care and precautions to prevent the foreseeable acts or omissions of the third party causing the release or threatened release.

*City of Detroit v. A.W. Miller, Inc.*, 842 F.Supp. 957, 964 (E.D.Mich.1994). *See also Lincoln Properties, Ltd. v. Higgins*, 823 F.Supp. 1528, 1539 (E.D.Cal.1992).

Plaintiff contends that Defendants are not entitled to the third-party defense because they cannot establish that the contamination of the riparian property was caused solely by other parties, and because they cannot establish that they acted with reasonable care and took precautions against the foreseeable acts or omissions of third parties.

The Court will defer discussion of the issue of causation until it addresses the evidence with respect to each individual defendant. There are, however, some common legal issues regarding reasonable care and precautions that require some discussion at this time.

■ Plaintiff takes the position that even if the PCBs in the river bed were released solely by plaintiff's members and migrated down the river, defendants would not be entitled to the third-party defense unless they could show that they took some affirmative action to clean up the hazardous substance or prevent its spread in order to be entitled to the third-party defense. Plaintiff cites *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321 (7th Cir.1994), in support of this contention. In *Kerr–McGee* the Seventh Circuit held that a defendant was not entitled to a third-party defense where it made no attempt to remove hazardous substances from its property, notwithstanding the fact that the defendant was not responsible for placing the hazardous substances on the property. *Id.* at 325.

Section 9607(b)(3) requires that the defendant establish that it exercised "due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances." 42 U.S.C. § 9607(b)(3).

The relevant facts and circumstances in *Kerr–McGee* are distinguishable from the relevant facts and circumstances of this case. The defendant in *Kerr–McGee* purchased property with knowledge that it had wood preservatives on it, but made no effort to remove the hazardous substances. *Id.* at 325. By contrast, in this case, Defendants contend that the degree of care to be exercised by one asserting the third-party defense must be considered in light of the defendants' riparian position and the fact that this is a passive migration case. The

public has unlimited access to the navigable waters, and the riparian owner has no right to control access to the property. The migration of hazardous materials downriver is not isolated to easily identifiable locations or time periods, but is rather spread throughout the river bed over a long-period of time.

The Court believes that riparian owners should not be required to take affirmative action to clean up the hazardous substance migrating down the river bed or prevent its spread in order to be entitled to the third-party defense. If that were the case, each and every property owner on the Kalamazoo River would be liable for the cost of the cleanup of Plaintiff's members' PCB contamination for having failed to prevent Plaintiff's members from contaminating their riparian property. CERCLA liability does not extend this far. Rather than placing an affirmative duty on riparian owners to cleanup or prevent the spread of contamination, the Court holds that the degree of care required for riparian owners who assert the third-party defense in passive migration cases is met if the riparian owner has not facilitated or encouraged the migration or spread of the hazardous substance and has not exacerbated the conditions at the Site. *See, Redwing Carriers*, 94 F.3d at 1508 (defendants "demonstrated they did nothing to exacerbate conditions at the Site.")[8]

With these principles in mind, the Court turns to the cross-motions regarding each of the three defendants.

8. Although not necessary to the setting of this standard, the Court observes that there is some recent recognition in the case law that passive migration may not be the kind of release that gives rise to owner liability. *See, e.g., ABB Ind. Systems v. Prime Technology, Inc.*, 120 F.3d 351, 358–59 (2d Cir.1997)("If a person merely controlled a site on which hazardous chemicals have spread without that person's fault, that person is not a polluter and is not one upon whom CERCLA aims to impose liability."); *Brookfield–North Riverside Water Comm'n v. Martin Oil Marketing, Ltd.*, No. 90 C 5884, 1992 WL 63274 (N.D.Ill. March 12, 1992)(There cannot be "several different releases of hazardous substances when it is undisputed that all the wastes came from a single source.")

9. Both OCC and DLK refer to cardboard. OCC is post-consumer use boxes and DLK is card-

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. *Menasha*

■ The Menasha Corporation has operated the Ostego mill since 1887. Menasha did not have a de-inking operation and did not recycle NCR paper. The facility produces only one product—corrugated medium board. For raw materials it uses wood chips, double-lined kraft ("DLK"), and old corrugated containers ("OCC").[9]

There is no evidence of any routine or systematic introduction of PCBs into Menasha's manufacturing process that would account for the presence of PCBs in the product or effluent. The evidence is uncontroverted that the only secondary fiber that Menasha recycled was old corrugated containers and double-lined kraft. There is, of course, a possibility that occasional odd papers might have slipped in. There is also evidence that as a result of general recycling efforts across the country, PCBs eventually became incorporated in other types of paper, which ultimately entered the general wastepaper stream.[10]

In support of its claim that Menasha is responsible for the release of PCBs to the Site, Plaintiff points to evidence that the finished product coming off the rolls at Menasha's Otsego mill has twice tested positive for PCBs and Menasha's effluent has tested positive for PCBs on four occasions.

board scraps that have not entered the stream of commerce.

10. Menasha's expert, Dr. Schell, states:

As a result of the intensive recycling efforts which started in the mid–1970s and continue on a large scale basis even today, these PCBs which originated in NCR paper have slowly infiltrated a large portion of the world's paper stock, albeit in a steadily decreasing concentration. Thus, in theory, any mill that uses even small quantities of post-consumer paper as furnish could have inadvertently introduced minute quantities of PCBs into the production line. Theoretically, this could have occurred with Menasha's use of OCC, and could provide one possible explanation for the low levels of PCBs detected in the Otsego mill's finished product in 1976 and 1983.

Between 1972 and 1992, Menasha sent its product out for PCB testing on 11 occasions. On two occasions, once in 1976 and once in 1983, the finished product tested positive for PCBs.[11] On the other nine occasions the tests were non-detect for PCBs.

Plaintiff contends that because there were PCBs in the finished product, there must also have been PCBs in the effluent. The correlation, however, is not so direct. Even if there were occasional PCBs in the feedstock that were integrated into the final product, it does not necessarily follow that the PCBs were also released into the river. Because PCBs have an affinity for solids and because they tend to settle, Menasha contends they would have been removed by Menasha's waste treatment system which is designed to remove solids from the effluent.

Plaintiff responds that there is evidence that on occasion Menasha has exceeded its NPDES Permit allowance for the discharge of suspended solids. Moreover, the system was at times prone to leaks. The fact that Menasha's waste treatment system is not 100% effective at removing solids is evidenced by the fact that on four occasions Menasha's effluent to the site has tested positive for PCBs. In October 1971, Menasha's effluent tested positive for PCBs at a concentration of 0.13 ppb. In 1975 it tested positive for PCBs at a concentration of 0.53 ppb. In 1985 Menasha's effluent to the Site tested positive at concentrations of 0.016 ppb and 0.020 ppb. Eight other MDNR tests of the effluent between 1974 and 1994 were non-detect for PCBs, including the August 1976 test, run within weeks of the positive test on the finished product.[12]

Menasha has raised a number of challenges to Plaintiff's evidence. Menasha challenges the accuracy and reliability of the test results. Menasha also explains that during the time of the purported positive PCB tests on its waste water, from 1971—1985, it drew in river water to use in both its non-contact cooling water system and its wastewater treatment system. The positive test results were no higher than the levels of PCBs in the Kalamazoo River at that time. Accordingly, as Plaintiff concedes, each of the samples could have been contaminated with PCB-laden river water and could have merely reflected PCB levels in the river, rather than Menasha's introduction of additional PCBs.

Nevertheless, on summary judgment "[t]he evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Schaffer v. A.O. Smith Harvestore Products, Inc.*, 74 F.3d 722, 727 (6th Cir.1996). Accordingly, for purposes of this motion, the Court will view the evidence in the light most favorable to KRSG, and draw all justifiable inferences in KRSG's favor. The Court will assume for purposes of this motion that some PCBs entered Menasha's feedstock through recycled cardboard or office paper, that some of those PCBs entered the waste stream, that some of those PCBs did not settle out during the waste treatment process, and were discharged into the Kalamazoo River.

These assumptions, however, are not sufficient to support Plaintiff's allegations of liability. The frequency and quantity of PCB releases by Menasha is purely theoretical and speculative. Moreover, even the best scenario involves incidental discharges of minuscule quantities. In comparison to the high level of PCBs that Plaintiff's members are responsible for, any PCBs released by Menasha fall far short of meeting the threshold-of-significance standard. The releases are so minimal by comparison that they do not equitably justify a response by Menasha. Summary judgment will accordingly be entered in favor of Menasha. Menasha's mo-

11. In 1976 three samples were each tested twice for Aroclors 1242 and 1254. 8 of the 12 tests were positive for PCBs. Five samples tested positive for Aroclor 1254 at levels of 0.4, 0.3, 0.3, 0.2 and 0.2 ppm. Three samples tested positive for Aroclor 1242 at levels of 0.4, 0.3 and 0.3 ppm. With respect to both of the 0.4 ppm results, the duplicate test showed a non-detect, and on one test it was noted that the chromatogram was distorted. In 1983, both composite samples tested positive for PCBs. One tested positive for Aroclor 1260 at 0.2 ppm. The other tested positive for Aroclor 1242 at 0.3 ppm and for Aroclor 1260 at 0.1 ppm.

12. The August 1976 water test was non-detect for PCBs at the lowest detection limit used by the MDNR (<0.0001 ug/1).

tion for summary judgment will be granted and Plaintiff's cross-motion for summary judgment will be denied.

■ Plaintiff contends that in any event, there is no question of fact that PCBs have been found in the river bed by Menasha's property, and that Menasha is accordingly liable as the owner of that property. As illustrated above, there is insufficient evidence of a release of PCBs by Menasha. Menasha's facility is located in Otsego, downstream from all of the facilities owned by KRSG's members. Defendants have presented overwhelming evidence that Plaintiff's members released massive amounts of PCBs into the Kalamazoo River upstream from Defendants' properties. Plaintiff's expert, Dr. Brown, has admitted that the PCBs travel downstream. PCBs located in the river bed next to the Menasha property are undoubtedly related to the actions of third-parties, including Plaintiff's members, rather than to Menasha. Plaintiff has offered nothing more than speculation to trace the PCBs in the river bed to the actions of Menasha. There is no evidence that the concentration levels of PCBs found in the river bed are any greater in front of Menasha's property than they are immediately upstream. Menasha could not have foreseen or prevented the migration of PCBs from upstream sources to the sediments adjacent to its property. There is no evidence that Menasha engaged in any activity that would have exacerbated the PCB contamination in the river adjacent to its property. Accordingly, Menasha is entitled to summary judgment on the issue of liability associated with its ownership of riparian property.

### B. *Pharmacia & Upjohn*

■ Pharmacia & Upjohn Company ("Upjohn") owns property at 439 Portage street that is riparian to the Site. The Riparian Property is on Portage Creek, one and a half miles downstream from Allied Paper. Upjohn uses the property as a parking lot and vacant space. There is no evidence that Upjohn has ever used the riparian property for any manufacturing operations or that it has ever used, stored, or released any PCBs on the property. Plaintiff nevertheless seeks to hold Upjohn liable under CERCLA strictly on the basis of PCB contamination in the river bed adjacent to the riparian property.

Upjohn is entitled to summary judgment with respect to this Riparian property. The undisputed evidence is that PCBs have never been used, stored or released on or from Upjohn's Riparian Property, and there is no evidence that PCBs were released by Upjohn upriver from this property. There can be no real dispute that any contamination of Upjohn's riparian property was caused solely by third-parties. Because there is no evidence that Upjohn did anything to aggravate the presence of hazardous substances in the river bed, the Court is satisfied that it meets the requirement that it used reasonable care and precautions.

■ KRSG has also presented arguments relating to three of Upjohn's non-riparian properties: 301 Henrietta Street ("Henrietta Property"), 2605 Kilgore Road ("Kilgore Property"), and 7171 Portage Road ("Portage Property"). Plaintiff's claims regarding these properties all rely on allegations of indirect discharges by Upjohn to the Kalamazoo Wastewater Reclamation Plant ("KWRP") and by the KWRP to the Site.

The only identified source of PCBs at these properties are oil curtain air handling units in operation from 1950 through the mid–1980s at the Henrietta and Portage Properties. Screens rotated through an oil bath, and dust and other particles in the air would stick to the oil until rinsed off in the oil bath. There were occasions when the screens were removed and rinsed off. The screens were rinsed in the basement of building 126 at the Henrietta facility and Building 41 of the Portage Road facility. During the rinsing process, some oil from the screens may have been rinsed down the drain. The screens were not rinsed on a regular basis. Three to five years might have passed between rinsing.

When the air handling units were removed in the mid–1980s, the oils used in the air handling units were sampled, and nearly all of the samples contained PCBs in the form of Aroclor 1254, in concentrations ranging from less than 10 ppm to 96 ppm. PCBs were

used in industrial applications to improve coating and adhesive properties of materials, including various oils. The use of PCBs in oil baths for roll filters was common in the 1950s and 1960s but the concentration of PCBs in these oils varied. There is no evidence in this case regarding the PCB level of the oils used by Upjohn.

The three non-riparian properties have been discharging wastewater to the KWRP Since the mid-1960's. Since 1991 the KWRP has required users to submit Semi-Annual Monitoring Reports for various constituents, including PCBs.

Approximately one-third of the samples taken by Upjohn from the Henrietta facility since 1991 have reflected the presence of PCBs at the point of discharge into the sewer collection system in concentrations ranging from .05ug/1(ppb) to 2.3 ug/1(ppb). The probable source of the reported PCB discharges was linked to three sumps connected to drains in the basement of Building 126. The sumps contained pumps that would from time to time pump water to the sanitary sewer line. In 1994 the three sumps in Building 126 of the Henrietta facility were found to contain PCB contaminated sludges (Aroclor 1254) at concentrations of 810 ug/1, 1300 ug/1, and 2500 ug/1. The sludge was removed in August 1994.

It is important to remember that the wastewater from the Henrietta Property was not discharged to the Kalamazoo River. It went to the KWRP. Since the KWRP began monitoring its wastewater effluent, PCBs have only been detected in the KWRP's effluent to the Kalamazoo River on 3 occasions. There is no evidence linking these discharges of PCBs by the KWRP to Upjohn. On December 6, 1990 and December 14, 1990, PCBs were reported in concentrations of 2.8 and 3.3 ug/1. On January 8, 1993, PCBs identified as Aroclor 1248 were reported in the effluent at a concentration of 1.3 ug/1. The 1990 releases were linked to vandalism of transformers at an abandoned facility. The 1993 release of PCBs was traced by the KWRP to a discharge from the HM Holdings (Allied Paper) dewatering lagoons.

The only evidence that PCBs were ever present in the wastewater from the Portage Property is a letter from the KWRP dated October 28, 1987, reporting that one sample dated June 24, 1987, contained Aroclor 1254 at a concentration of .05 ug/1. This level of detection was very low, given the technology that was available at the time. The KWRP never required Upjohn to take further action with respect to the finding at the Portage Property.

Three tests have shown PCBs in the effluent from the Kilgore Property in concentrations of .16 ug/1, .56 ug/1 and .3 ug/1. No possible source of PCBs has ever been identified at the Kilgore Property, and no PCBs have been reflected in the testing since May 27, 1993.

Plaintiff contends that despite the lack of documentary evidence substantiating any release of PCBs by Upjohn to the Site, Upjohn undoubtedly discharged significant amounts of PCBs to the Site over a 25 year period before it began sampling its wastewater for PCBs. Plaintiff contends that particularly from 1965-1985, when the air curtains were in use and were being rinsed, more significant concentrations of PCBs would have been discharged in Upjohn's effluent to the KWRP. According to Plaintiff, because the Portage Property did not have sumps, all the PCBs from the Portage Property were discharged directly to the KWRP.

Plaintiff also notes that the KWRP, as initially constructed in 1953, provided only primary treatment for removal of solids through settling and screening. In 1964 secondary treatment began to be provided. The KWRP's Particulate Activated Carbon Treatment system has only been in operation since 1985. Since 1988 the KWRP has been required under its National Pollutant Discharge Elimination System ("NPDES") permit to monitor its own discharges to the Site for PCBs down to a method detection limit of 0.1 ug/1 (ppb or parts per billion). The effluent to the river is sampled twice per month. According to Plaintiff's expert, Dr. Kenneth Z. Crumrine, since 1985 only 1 to 2% of Upjohn's PCBs would have entered the Kalamazoo River. However, from 1965 to 1985, an average of 47.1 % of Upjohn's PCB's would have entered the Kalamazoo River.

Plaintiff's historic case regarding the Upjohn facilities is speculative at best. There is little concrete information on the level of PCBs in the air curtain oil, the amount of oil that would have been released in a rinsing operation, the amount of PCBs that would have been released during rinsing, the amount of PCBs that would have made their way into the effluent from Upjohn to the KWRP, and the amount of PCBs that would have found their way from the KWRP to the Kalamazoo River. Even when viewed in the light most favorable to Plaintiff, and drawing all reasonable inferences in Plaintiff's favor, the evidence does not amount to a significant release of PCBs to the Site. Rinsing of the air curtain screens was not a daily or frequent project. It was done on a sporadic basis, sometimes 3 to 5 years apart, sometimes less often. At best, it resulted in the occasional and incidental release to the KWRP of very small quantities of PCBs. The effluent from Upjohn then had to go through a wastewater treatment plant whose very purpose was to remove solids and hazardous substances from the wastewater, and under the Plaintiff's best scenario would have removed half of the PCBs. Plaintiff's evidence of theoretical, sporadic and indirect discharges of minute quantities of PCBs through the KWRP does not meet the threshold of significance standard. It is not sufficient to justify the incurrence of response costs by Upjohn. Accordingly, Upjohn's motion for summary judgment will be granted, and Plaintiff's cross-motion for summary judgment will be denied.

## C. Rock-Tenn

■ Defendant Rock–Tenn owns a recycled paperboard mill downstream from the facilities owned by KRSG's members in Otsego, Michigan. Rock–Tenn purchased the Otsego mill in January 1988 from Mead Corporation. During both Mead and Rock–Tenn's ownership of the mill, the mill has manufactured 100% recycled multi-ply paperboard from various grades of recycled paper, including mixed office waste. It is generally accepted that PCBs would have been absent from the paper recycled in recycled paper mills by 1980.

Rock-Tenn purchased the mill nearly 17 years after the cessation of PCB use in the paper industry. Accordingly, it is unlikely that Rock–Tenn's current operations are a source of PCBs. Rock–Tenn contends that according to its expert's report, it cannot be held liable for the release of significant amounts of PCBs to the river. In 1993 and 1994 Rock–Tenn investigated the possibility that its operations were contributing PCBs to the Site. The tests conducted by its consultant, Conestoga–Rovers & Associates ("CRA"), demonstrated that there were no PCBs in the plant feedstock, wastewater discharge or wastewater treatment sludge associated with current operations. Rock–Tenn also investigated the possibility that PCBs deposited at the mill by prior owners could migrate to the Kalamazoo River. They collected soil, water and groundwater samples from former residual disposal areas, drainage routes relative to such areas, and production wells downgradient from the disposal areas. Their analysis showed that the former disposal areas were not releasing PCBs to the Kalamazoo River.

Despite the exculpatory nature of Rock–Tenn's expert's report, this Court must look at the evidence in the light most favorable to Plaintiff. Plaintiff has come forward with evidence that during Mead's ownership of the mill, PCBs were released to the River on a continuous basis. The mill's process water and effluent to the Kalamazoo River tested positive for PCBs on over 45 separate occasions at concentrations ranging from .05 ppb to 29 ppb. Mead's wastewater was treated on-site through clarifiers, two aeration lagoons, and one final settling pond. The wastewater was discharged from the final settling pond directly to the Kalamazoo River. The lagoons steadily filled up with PCB-contaminated paper-making residuals. In 1978 the sludge in Mead's de-watering pit contained a PCB concentration of 20,000 ppb.

Plaintiff has presented evidence that PCBs released into the treatment facilities during Mead's ownership remain in those aeration and stabilization lagoons today and continue to be resuspended and released on a consistent basis to the Kalamazoo River as a result of Rock–Tenn's operations.

It is undisputed that these treatment lagoons have not been dredged or excavated in any way for over 20 years. Rock–Tenn has continued to use this waste treatment system since its purchase of the mill without making any essential changes to it. As a result of the sludge, the depth of the first aeration lagoon has been decreased from 13 feet to 9.84 (24% loss of capacity); the depth of the second aeration lagoon has been decreased from 5.4 feet to 1.86 feet (65% loss of capacity); and the depth of the final settling pond, also known as the stabilization lagoon, has been decreased from 7.8 feet to 0.8 feet (90% loss of capacity). Earth Tech Operations Services, a company contracted by Rock–Tenn to analyze methods of reducing odor problems at the wastewater plant, stated in its 1994 report that the stabilization lagoon was not operating according to its design, and virtually no solids were settling prior to discharge to the river.

Rock-Tenn has frequently reported exceedences under its NPDES Permit for total suspended solids in its effluent. There is also evidence that Rock–Tenn has underreported the level of solids in its waste water because MDNR tests showed suspended solids twice and 10 times as high as Rock–Tenn's tests. Plaintiff has also come forward with evidence that because of Rock–Tenn's aerators in the lagoons, the sludge gets mixed up, and is not resting in historic layers.

Since assuming control of the mill in 1988, Rock–Tenn has had a valid National Pollution Discharge Elimination System permit ("NPDES permit") authorizing its discharge of wastewater directly to the Kalamazoo River. On 3 occasions during Rock–Tenn's ownership (in 1994, 1996 and 1997) PCBs have been detected in the process water and effluent.

The MDEQ has detected PCBs in Rock–Tenn's effluent during three separate Industrial Wastewater Surveys, in 1994, 1996 and 1997 as follows: 1994, Aroclor 1242 of .47 ug/1; 1996, Aroclor 1242 .22 ug/1; and 1997 Aroclor 1248 of .19 ug/1 ppb.

Defendant Rock–Tenn contends that there is no competent evidence that it ever released any PCBs to the Site. Rock–Tenn contends that the records of PCB discharges during Mead's ownership and the MDEQ records of PCBs released by Rock–Tenn are not competent evidence because Plaintiff has not authenticated the documents and has not validated the test results.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R.Evid. 901(a). In the case of public records, evidence that the purported public record or report is from the public office where items of this nature are kept is sufficient for authentication. Fed.R.Evid. 901(b)(7). No real issue has been raised as to the authenticity of the documents Plaintiff relies on, and the Court is satisfied that the documents may be considered for purposes of these summary judgment motions.

Instead, at oral argument Rock–Tenn focused on the hearsay nature of the documents. Although public records and reports are not generally excluded by the hearsay rule, they do not come within the hearsay exception if "the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8).

The party opposing admission of the reports has the burden of proving that they are not trustworthy. *Thompson v. Office and Professional Employees Intern. Union, AFL–CIO*, 74 F.3d 1492, 1506 (6th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 482, 136 L.Ed.2d 376 (1996). Rock–Tenn contends the MDEQ tests are not "trustworthy" because the several samples are not identical, no PCBs were detected in the grab samples, the test results include the notation "estimated value; value may not be accurate," and a letter from the MDEQ notes that the samples taken might not be representative.

To determine whether a report is "trustworthy," a court should consider, among other factors, the timeliness of the investigation, the special skill or experience of the investigators, whether a hearing was held, and possible motivational problems. Rock–Tenn has not shown that the MDEQ

water testers were unqualified, or that their tests results were affected by any feelings of ill will toward Rock–Tenn. Rock–Tenn's contentions that the tests are invalid and not representative, go to the scientific accuracy of the tests. These are issues that go to the weight to be accorded to the evidence, not to its admissibility. These are questions of fact for trial. Rock–Tenn has not met its burden of showing that the test results should be held inadmissible for lack of trustworthiness.

■ In support of its argument that it should not be responsible for any of the response costs at the Site, Rock–Tenn notes that the State has not pursued Rock–Tenn as a responsible party at the Site. Not being named by the State as a PRP is no defense to a contribution action under § 113(f). The State may delay or decline to pursue a party for a number of reasons that do not bear on the defendant's potential responsibility, including staffing and time constraints.

The Court is satisfied that the evidence, viewed in the light most favorable to KRSG, is sufficient to support a reasonable inference that Rock–Tenn has been releasing PCBs on a regular basis for the last ten years. There is at least a question of fact as to whether PCBs are being resuspended and discharged by Rock–Tenn on a regular basis to the Kalamazoo river. Although the time period of Rock–Tenn's ownership of the facility is relatively short, and the total quantity of PCBs allegedly released appears to be very small compared to the releases by Plaintiff's members, this Court cannot say, as a matter of law, that the evidence fails to meet the threshold of significance. In contrast to Upjohn's situation, the alleged releases in this case are not attributed to sporadic cleaning activities. They are attributed to daily wastewater treatment practices. Moreover, a high concentration of PCBs has been detected in the lagoons, and Rock–Tenn's release is directly to the River.

Because there is evidence of releases by Rock–Tenn, there is an issue of fact as to whether the contamination of the river bed adjacent to Rock–Tenn's party was caused solely by Rock–Tenn. The Court accordingly cannot grant Rock–Tenn summary judgment on the third-party defense.

There are issues of fact for trial that preclude the entry of summary judgment for either Rock–Tenn or KRSG at this time. The question of the sufficiency of the evidence against Rock–Tenn must be reserved for trial. It is worth noting, however, that even if the liability of Rock–Tenn is established at trial, the damages attributable to Rock–Tenn during the allocation phase may very well prove to be de minimis in comparison to the well-documented and extensive liability of Plaintiff's members.

For the foregoing reasons, the motions for summary judgment brought by Defendants Menasha and Upjohn will be granted, and summary judgment will be entered in favor of Menasha and Upjohn. The motion for summary judgment brought by Defendant Rock–Tenn will be denied, and the cross-motions brought by Plaintiff KRSG will be denied.

An order consistent with this opinion shall be entered.

### ORDER AND PARTIAL JUDGMENT

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED** that Defendant Pharmacia and Upjohn Company's motion for summary judgment (Docket # 520) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant Menasha Corporation's motion for summary judgment (Docket # 541) is **GRANTED.**

**IT IS FURTHER ORDERED** that judgment is entered for Defendants Pharmacia and Upjohn Company and Menasha Corporation.

**IT IS FURTHER ORDERED** that Defendant Rock–Tenn Company, Mill Division's motion for summary judgment (Docket # 622) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff KRSG's motions for summary judgment against Defendants Pharmacia and Upjohn Company, Menasha Corporation, and Rock–

Tenn Company, Mill Division, Inc. (Docket # 's 565, 584, and 648) are **DENIED**.