Revised December 3, 1998

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 96-31226**

---

**UNIROYAL CHEMICAL COMPANY, INC.,**

**Plaintiff-Appellant,**

**VERSUS**

**DELTECH CORP.; ET AL.,**

**Defendants,**

**SAFEWAY TRANSPORTATION, INC.; TMI ENTERPRISE, INC.,**

**Defendants-Appellees.**

---

Appeal from the United States District Court
for the Middle District of Louisiana

November 10, 1998

Before MAGILL,[1] SMITH, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

This litigation arises from the rupture of a tanker truck parked at a trucking terminal in Port Allen, Louisiana, resulting in the release of a hazardous industrial chemical into the surrounding environment. Uniroyal Chemical Company, Inc.

---

[1] Circuit Judge of the Eighth Circuit, sitting by designation.

("Uniroyal"), the appellant, responded to the release and brought suit against other involved parties to recover its clean-up costs in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9600 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub. L. No. 99-499, 100 Stat. 1613 (1986). Uniroyal now appeals the district court's grant of summary judgment in favor of the defendants. We vacate the district court's judgment and remand this action for entry of judgment in favor of Uniroyal.

## I.  FACTS

In July 1993, a driver working for Safeway Transportation, Inc. ("Safeway") picked up a load of Vinyl Toluene ("VT") at an industrial facility owned by Deltech Corporation in Baton Rouge, Louisiana.  The VT was taken in a tanker truck, which Safeway was leasing from TMI Enterprises, Inc. ("TMI"), to a facility owned by Uniroyal in Bay Minette, Alabama.  There, Uniroyal added Naugaurd I-5 ("I-5") to the VT load.[2]  The resulting mixture was then

---

[2]    Deltech is the sole producer of VT.  VT is used by Deltech as a component of a resin product manufactured and sold by Deltech.  I-5 on the other hand, is a product manufactured by Uniroyal.  Deltech used I-5 to inhibit the polymerization of VT. The VT/I-5 mixture was destined for use by Deltech in the production of a resin which would then be used to make other products like paint and glue.  There is no dispute that the VT/I-5 mixture was a useful industrial product, and was not in the process of being disposed of as a hazardous waste.

transported back to Louisiana where, in Port Allen, the tanker truck parked for the night at a TMI trucking terminal. The VT/I-5 mixture was scheduled for delivery at the Deltech facility in Baton Rouge the following day.

Early the next morning the tanker truck ruptured while parked at the TMI facility, releasing 21 tons of the VT/I-5 mixture into the surrounding environment. Environmental officials from the State of Louisiana promptly arrived at the scene and, after evaluating the possible threat to public safety and the environment, advised representatives of Uniroyal, Safeway, TMI, and others that emergency action was needed. Only Uniroyal responded to the request. As part of the clean-up process, nearby waterways were blocked, contaminated soil was removed, and hundreds of thousands of gallons of contaminated stormwater were collected and treated. In all, Uniroyal incurred response costs in excess of $2,300,000, for which it was refused reimbursement by the other parties.

Uniroyal then filed suit in federal district court against Safeway, TMI, and other involved parties.[3] In addition to state-law claims not at issue in this appeal, Uniroyal asserted a claim against TMI and Safeway ("defendants") under CERCLA, seeking to

---

[3]   Deltech was originally named as a defendant, but eventually settled with Uniroyal and is not a party to the present appeal.

3

recover the costs it incurred in responding to the rupture.[4]
Uniroyal brought its private cost recovery action under
§ 9607(a)(1) of the statute, which imposes liability on the "owner
or operator" of a CERCLA "facility."[5]   42 U.S.C. § 9607(a)(1).

Uniroyal's CERCLA claim against the defendants came before the
district court on cross motions for summary judgment; one filed by
Uniroyal and one filed jointly by the defendants.  At a subsequent
hearing on the motions the parties agreed that there were no
triable issues of fact and that the court could decide Uniroyal's
claim as a matter of law.  In a later written order the court
denied Uniroyal's motion for summary judgment, granted judgment in
favor of the defendants, and dismissed Uniroyal's CERCLA claim.
That ruling was the result of the district court's consideration of
the two separate issues of statutory construction that now form the
basis of the present appeal.

The first issue addressed by the court was whether Uniroyal
had established that the defendants were "responsible persons"
under the statute, a required element of its CERCLA claim.  *See*
*Licciardi v. Murphy Oil U.S.A., Inc.*, 111 F.3d 396, 398 (5th Cir.
1997) (listing the four elements of a CERCLA cause of action).  The

---

[4]     Uniroyal specifically limited its CERCLA claims to TMI
and Safeway.  It did not assert CERCLA claims against any other
defendants.

[5]     The parties do not dispute whether TMI, the carrier, and
Safeway, the owner of the tanker truck and the trucking terminal,
qualify as owners or operators under § 9607(a)(1) of the statute.

4

defendants argued that Uniroyal could not legally make that showing because § 9607(a)(1), the provision on which Uniroyal's claim was based, must be read to contain a disposal requirement that conditions liability on the disposal of a hazardous waste.[6]  As there is no express disposal requirement in that provision, the defendants urged the district court to infer one based on the theory that CERCLA applies only to disposals at inactive or abandoned waste sites.  The district court rejected the defendants' contentions, relying simply on the fact that the text of § 9607(a)(1) does not expressly contain a disposal requirement.

The district court next considered whether Uniroyal had proven the existence of a CERCLA "facility," another required element of its CERCLA claim.  *See* 42 U.S.C. §§ 9601(9) & 9607(a)(1).  The defendants alleged that Uniroyal could not meet that requirement due to an exception in § 9601(9) that excludes from the definition of facility any "consumer product in consumer use."  The defendants argued that the consumer product exception was applicable in this case because the term "consumer product" must be construed as including all useful, non-waste products, not just goods used by individual consumers.  The district court agreed.  Relying exclusively on our decision in *Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059 (5th Cir. 1990), the district

---

[6]     This case, by comparison, involves an accidental release of a useful commercial product.

5

court found that "all hazardous substances with a useful purpose in production activities qualify under the consumer product exception." *Id*. at 1065-66. The Court then reasoned that because the VT/I-5 mixture was a useful product, and the defendants were engaged in commercial conduct at the time the rupture occurred, the consumer product exception applied, precluding Uniroyal from satisfying the facility requirement.

The district court, however, expressed considerable doubt about the correctness of its decision. Though finding itself bound by **Dayton**, the district court warned that our decision in **Dayton** was at odds with the plain wording of the exception. The district court further observed that several courts outside of this Circuit had interpreted the consumer product exception as applying only to consumer goods used for personal consumption. The district court certified its ruling as a final judgment under Rule 54(b) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 54(b). Uniroyal appeals the district court's dismissal of its CERCLA claim. The defendants jointly defend that ruling.

## II.  STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the same standards as those applied by the district court. *OHM Remediation Servs. v. Evans Cooperage Co., Inc.*, 116 F.3d 1574, 1579 (5th Cir. 1997). In a typical summary-judgment

6

appeal we look to whether there are genuine issues of material fact that would have precluded judgment as a matter of law. Fed. R. Civ. P. 56(c); *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). In this case, however, the parties concede there are no triable issues of fact, and we accept that stipulation. Accordingly, the proper focus in this appeal is on whether the district court adhered to the proper legal principles in granting summary judgment to the appellees.

## III. DISCUSSION

In this appeal we are faced with the same two issues of statutory construction that were raised and argued before the district court. We first must decide whether Uniroyal established that the defendants are responsible persons under § 9607(a)(1) of CERCLA. In deciding that question we must consider the defendants' claim that § 9607(a)(1) must necessarily contain a disposal requirement because Congress explicitly intended that CERCLA apply only to disposals at inactive or abandoned waste sites. That is an issue of first impression in this Circuit and, to our knowledge, in any United States Court of Appeals.

If we decide that CERCLA is not that narrow, we next must decide whether the consumer product exception precludes Uniroyal from proving the existence of a CERCLA facility, another required element of its cause of action. That question, if reached, will

7

require us to revisit our holding in **Dayton** to determine whether it governs our application of the consumer product exception in the instant appeal.  If **Dayton** is not controlling, we will be required to address the meaning of the consumer product exception in considering whether it applies to all useful products, or to only goods used for individual or personal use.  We begin our analysis with an overview of CERCLA as it relates to the present appeal.

## A.  Applicable Law

CERCLA was enacted in 1980 as a broad remedial measure aimed at assuring "that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions."  S. Rep. No. 96-848, at 13 (1980); *see also* **OHM Remediation Services**, 116 F.3d at 1578 (acknowledging CERCLA's broad remedial purpose).  In light of that purpose we are obligated to construe its provisions liberally in order to avoid frustrating Congress' intent.  *See* **Schiavone v. Pearce**, 79 F.3d 248, 253 (2d Cir. 1996) (recognizing same obligation).

The statute operates through a bifurcated scheme to promote the cleanup of hazardous substances that have been released into the environment.  *See* **3550 Stevens Creek Assocs. v. Barclays Bank of California**, 915 F.2d 1355, 1357 (9th Cir. 1990) (explaining the bifurcated scheme), *cert. denied*, 500 U.S. 917 (1991).  First, through the creation of the Hazardous Substance Response Trust

8

Fund, or Superfund, 42 U.S.C. § 9631, CERCLA provides money to the federal government for waste site cleanup, 42 U.S.C. § 9604, or for compensating other governmental or individual parties who have incurred response costs, 42 U.S.C. § 9611(a)(2). Second, CERCLA also affords private parties the right to bring a cost-recovery action against "responsible persons" for costs associated with responding to an environmental threat. 42 U.S.C. § 9607(a); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667 (5th Cir. 1989).

To establish a prima facie case for a private cost-recovery action, a plaintiff must prove: (1) that the site in question is a "facility" under § 9601(9), *see* 42 U.S.C. § 9607(a); (2) that the defendant is a "responsible person" under § 9607(a), *see* 42 U.S.C. § 9607(a); (3) that a release or threatened release of a hazardous substance occurred, *see* 42 U.S.C. § 9607(a)(4); and (4) that the release or threatened release caused the plaintiff to incur response costs, *see* 42 U.S.C. § 9607(a)(4).[7] *Licciardi*, 111 F.3d at 398; *Amoco Oil Co.*, 889 F.2d at 668; *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988). If the plaintiff successfully establishes those elements, and the defendant is unable to prove one of the defenses listed in

---

[7] CERCLA does not expressly identify the prima facie elements of a cost recovery action. Instead, the statute merely lists four classes of potentially liable parties, commonly referred to as "responsible persons," 42 U.S.C. § 9607(a). It is from this list of responsible persons that courts have derived the elements of a prima facie case.

9

§ 9607(b), the plaintiff is entitled to summary judgment.[8]  *See* 42 U.S.C. § 9607(b); ***Amoco Oil Co.***, 889 F.2d at 668; *see also* ***OHM Remediation Services***, 116 F.3d at 1578 (observing that because CERCLA is a strict liability statute plaintiffs generally are not required to prove causation).

In this appeal, the third and fourth elements of the prima facie case are not at issue.  The parties do not dispute that there was a release or threatened release of a hazardous substance, and that Uniroyal incurred costs in responding to the accident.  Accordingly, our sole concern in this appeal is whether Uniroyal satisfied the first two elements of its prima facie case.

The first element of Uniroyal's claim is the requirement that the site in question constitute a CERCLA "facility."  That term is defined in the statute as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, *motor vehicle, rolling stock*, or aircraft, or (B) *any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located*; but does not include any consumer product in consumer use or any vessel.

---

[8]  To establish a defense under § 9607(b), a defendant must prove by a preponderance of the evidence that the release or threat of a release of a hazardous substance and the resulting damages "were caused solely by--(1) an act of God; (2) an act of war; [or] (3) an act or omission of a third party . . . ."  42 U.S.C. § 9607(b).

42 U.S.C. § 9601(9) (emphasis added).  Of particular relevance to the present appeal is the final phrase of that definition.  That phrase, which is not defined in CERCLA itself, excludes from the definition of facility "any consumer product in consumer use."  Because the existence of a CERCLA "facility" is an essential element of a CERCLA claim, that exception, often referred to as the consumer product exception, may take on considerable importance.  If found to be applicable, it has the effect of removing a case from the scope of CERCLA liability.

It is worth noting as a preliminary matter that in CERCLA cases that involve toxic waste sites, the consumer product exception is often beyond the pale of consideration since waste sites, by definition, involve waste materials and not useful consumer products.  In cases like the present, however, where there is an unexpected release of a useful commercial substance, the applicability of the consumer product exception is less certain.  In these types of cases the applicability of the exception will depend on how broadly a court reads the term "consumer product."

The second prima facie element that Uniroyal must establish is the "responsible person" requirement.  Section 9607(a) of CERCLA makes four classes of "responsible persons" liable for response costs:

> (1)  the [present] owner and operator of . . . a facility,
>
> (2)  any person who at the time of disposal of any hazardous substance owned or operated any

11

> facility at which such hazardous substances
> were disposed of,
>
> (3) any person who by contract, agreement, or
> otherwise arranged for disposal or treatment,
> or arranged with a transporter for transport
> for disposal or treatment, of hazardous
> substances owned or possessed by such person
> . . . , at any facility . . ., and
>
> (4) any person who accepts or accepted any
> hazardous substances for transport to disposal
> or treatment facilities . . . or sites
> selected by such person, . . . .

42 U.S.C. § 9607(a); *Joslyn Mfg. Co. v. Koppers Co., Inc.*, 40 F.3d 750, 760 (5th Cir. 1995). In this case, Uniroyal's CERCLA claim was brought under § 9607(a)(1). That cause of action, known as an owner-operator claim, imposes strict liability on the present owner or operator of a CERCLA facility from which there is a release or threatened release of a toxic substance. *Tanglewood East Homeowners*, 849 F.2d at 1572. Having set forth these basic principles, we turn to the merits of the instant appeal.

### B. Responsible Persons & the Scope of CERCLA Liability

The first issue for decision is whether Uniroyal sufficiently established that the defendants are "responsible persons" under § 9607(a)(1) of the statute. On appeal, the defendants allege that Uniroyal failed to carry that burden because there is no evidence of waste disposal in this case. According to the defendants, the disposal of a hazardous waste is an inherent and unavoidable requirement for bringing a claim under § 9607(a)(1). We disagree.

12

The starting point for statutory interpretation is the language of the statute itself. *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330 (1978) (citations and quotations omitted). When that language is plain we must abide by it; we may depart from its meaning only to avoid a result "so bizarre that Congress 'could not have intended' it". *Demarest v. Manspeaker*, 498 U.S. 184, 191 (1991) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). Accordingly, "[i]f the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).

In § 9607(a), a disposal requirement is contained in three of the four classes of responsible persons, *see* 42 U.S.C. §§ 9607(a)(2) - (4). But that requirement is not present in the first class. *See* 42 U.S.C. § 9607(a)(1); *California v. Blech*, 976 F.2d 525, 526-27 (9th Cir. 1992) (acknowledging lack of disposal requirement). Unlike the three other classes of responsible persons, where the word "disposal" is expressly employed in the

13

statutory text, § 9607(a)(1) simply holds liable "the [present] owner and operator of a vessel or a facility." *Id.* There is not the slightest reference in that section to a disposal.[9]

The defendants acknowledge that the text of § 9607(a)(1) does not expressly contain a disposal requirement, but assert that we must infer one nonetheless because Congress intended CERCLA to apply only to inactive or abandoned waste sites. That intent, the defendants allege, is reflected in the overall statutory scheme of CERCLA, in the legislative history of the statute, and in case law. The basic thrust of their argument is that we would be frustrating the expressed intent of Congress by allowing the imposition of CERCLA liability in this case. We review each purported source of this alleged intent in turn.

### 1. The Statutory Text

The defendants allege that it is a mistake to read § 9607(a)(1) in isolation. They insist that when it is viewed in

---

[9] One of the defendants' arguments suggests that we must read a disposal requirement into § 9607(a)(1) in order to maintain some sort of internal consistency within the provision. That contention implies that Congress merely forgot to include the word disposal in the language of § 9607(a)(1). We do not agree. When Congress includes particular language in one statutory provision, and excludes it in another, we generally assume that Congress did so intentionally. *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also* *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) ("[W]here Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.").

14

conjunction with CERCLA as a whole, it becomes evident that Congress wanted to confine liability under the statute to cases that involved waste disposal sites. We disagree. CERCLA's core provisions suggest, quite to the contrary, that through the statute Congress sought to address hazardous releases generally, not just disposals at hazardous waste sites.

Section 9601(9) is the provision in CERCLA that defines the term "facility." It is a crucial provision because CERCLA liability cannot be imposed unless the site in question constitutes a facility. 42 U.S.C. § 9607(a); *see also* **Licciardi**, 111 F.3d at 398 (listing facility as the first element of the prima facie case). Therefore, the manner in which Congress chose to define the term provides critical insight into the intended scope of the statute.

In examining the contours of § 9601(9), it is apparent that facility is defined in the broadest possible terms, encompassing far more than traditional waste sites. It expressly includes buildings, pipelines, motor vehicles, rolling stock, wells, and aircraft. 42 U.S.C. § 9601(9)(A). In addition, sites that do not otherwise satisfy the definition are swept within its purview by a catch-all phrase that applies to "any site or area where a hazardous substance . . . otherwise comes to be located." 42 U.S.C. § 9601(9)(B). That expansive definition is strong evidence that Congress did not intend to limit CERCLA to waste disposal

15

sites.

Other key CERCLA provisions reflect the same intent. To impose liability under the statute, a plaintiff must also prove that there was a "release or threatened release" of a "hazardous substance." Under § 9601(22), the term "release" is defined as follows:

> (22) The term "release" means any *spilling, leaking*, pumping, pouring, emitting, emptying, discharging, injecting, *escaping*, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . .

42 U.S.C. § 9601(22) (emphasis added).[10] The acts listed in that definition reach well beyond the mere act of disposal, effectively reaching any means by which a hazardous substance finds its way into the environment. That point is reinforced, we think, by the fact that the word "disposing" is expressly listed in the definition as only one of many different acts that qualify as a release under § 9601(22).

---

[10] By contrast, the term "disposal," which is employed in the text of the three other classes of responsible persons in § 9607(a), but not § 9607(a)(1), is defined more narrowly. Under § 9601(29), "disposal" is defined, by reference to the Solid Waste Disposal Act, 42 U.S.C. § 9603(3), as:

> [T]he discharge, deposit, injection, dumping, spilling, leaking or placing *of any solid waste or hazardous waste* into or on any land or water . . . .

42 U.S.C. § 6903(3) (emphasis added).

16

Similarly, the definition of "hazardous substance" in § 9601(14) covers far more than mere waste material. That provision states:

> (14) The term "hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) *any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act . . . ,* (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, . . . and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(22).[11] Notice that in this definition hazardous

---

[11] By comparison, § 6903(27) of the SWDA defines "solid waste" as follows:

> (27) The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material . . . .

42 U.S.C. § 6903(27). Similarly, § 6903(5) of the SWDA defines "hazardous waste" as follows:

> (5) The term "hazardous waste" means a solid

17

waste is expressly made a subset of hazardous substances generally, a strong indication that waste disposal is not the only possible basis for CERCLA liability. Furthermore, in defining the term hazardous substance Congress specifically excluded oil and natural gas. We must assume that if Congress wanted to exclude all useful substances it would have done so in like fashion. Finally, we note that § 9601(14) covers a staggering array of hazardous substances; pursuant to subsection (B) of § 9601(14), the EPA has designated over 700 hazardous substances. *See* 40 C.F.R. § 302.4 (1998). It is telling indeed that some of those substances are listed in their generic chemical names, whereas others are more specifically described as waste products.

To accept the defendants' claim that CERCLA applies only to waste disposal sites, this Court would have to ignore the broadly stated definition of "facility." We also would have to accept the

---

waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious character-istics may --

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

18

notion that, in the context of this case, there is no meaningful difference between a release and a disposal, or a hazardous substance and a hazardous waste, even though Congress chose separate and differing definitions for those terms.  We cannot embrace such a tortured construction of the statute without clear legislative history indicating that Congress intended to restrict CERCLA to hazardous waste sites.

### 2.  The Legislative History

The defendants contend that the legislative history of CERCLA demonstrates that the only legislative aim of the statute is the clean up of waste disposal sites.  Uniroyal vigorously refutes that assertion.  It insists that although CERCLA found its beginnings in the problems associated with toxic waste sites, the statute emerged from the legislative process as a broad remedial measure designed to address releases of hazardous substances generally.  Uniroyal's contention rings true.

In the late 1970s the threat posed by toxic waste sites was brought to the forefront of public awareness by the well-publicized disasters at Love Canal and Valley of the Drums.  S. Rep. 96-848, at 96 (1980); 125 CONG. REC. S7695 (1980).  Congress responded in 1980 by passing CERCLA, a compromise measure that was hastily enacted in the final days of the lame-duck session of the 96th Congress.  *See generally*, Grad, A Legislative History of the

19

Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980, 8 COLUM. J. ENV. L. 1 (1982) (summarizing and analyzing CERCLA's legislative history) (hereinafter "Grad"). Due to its hurried passage, it is widely recognized that many of CERCLA's provisions lack clarity and conciseness. A multitude of courts have roundly criticized the statute as vague, contradictory, and lacking a useful legislative history. *See*, *e.g., **HRW Sys., Inc. v. Washington Gas Light Co.***, 823 F. Supp. 318, 327 (D. Md. 1993) ("the legislative history of CERCLA gives more insight into the 'Alice-in-Wonderland'-like nature of the evolution of this particular statute than it does helpful hints on the intent of the legislature")*; **Rhodes v. County of Darlington***, 833 F. Supp. 1163, 1174 (D.S.C. 1992) ("CERCLA is not a paradigm of clarity or precision. It has been criticized frequently 'for inartful drafting and numerous ambiguities attributable to its precipitous passage.'") (quoting **Artesian Water Co. v. New Castle County**, 851 F.2d 643, 648 (3d Cir.1988))*; **In re Acushnet River & New Bedford Harbor***, 716 F. Supp. 676, 681 n.6 (D. Mass. 1989) (complaining of the "difficulty of being left compassless on the trackless wastes of CERCLA")*; **United States v. Wade***, 577 F. Supp. 1326, 1331 (E.D. Pa. 1983) (noting that the legislative history of CERCLA is "unusually riddled by self-serving and contradictory statements"). We too have bemoaned the sparse and often contradictory legislative history that led to the enactment of CERCLA. *See **Amoco Oil Co.**,*

889 F.2d at 677 (stating that CERCLA has "acquired a well-deserved notoriety for vaguely-drafted provisions and an indefinite, if not contradictory, legislative history," *quoting* **United States v. Mottolo**, 605 F. Supp. 898, 902 (D.N.H. 1985)).

Here, however, the legislative history of CERCLA is remarkably clear with respect to the core legislative purposes behind the passage of the statute. In its final version CERCLA was a compromise among three competing bills then under consideration by Congress: House of Representatives Bill 85 ("H.R. 85"), House of Representatives Bill 7020 ("H.R. 7020"), and Senate Bill 1480 ("S. 1480"). Grad, *supra*, at 1; THE ENVIRONMENTAL LAW INSTITUTE, SUPERFUND: A LEGISLATIVE HISTORY xiii (Helen C. Needham & Mark Henefee eds., 1982) (hereinafter "Superfund"). H.R. 85 was entitled the Oil Pollution Liability and Compensation Act, and was introduced into the House of Representatives on January 15, 1979. Grad, *supra*, at 3. As its name suggests, H.R. 85 targeted oil pollution by establishing a comprehensive system of liability and compensation for oil-spill damage and clean-up costs. *Id.* at 3-4.

H.R. 7020 was introduced by Congressman Florio on April 2, 1980. *Id.* at 4. Entitled the Hazardous Waste Containment Act, the bill was intended to regulate inactive waste sites by establishing reporting, monitoring and clean-up schemes. *Id.* This bill, by its terms, applied only to hazardous waste sites, and did not purport to address all hazardous releases. *Id.* at 5.

21

S. 1480, the third and final bill, was introduced in the Senate on July 11, 1979 by Senators Muskie, Stafford, Chafee, Randolph, and Monyihan. *Id.* at 6. This bill, entitled the Environmental Emergency Response Act, was by far the broadest and most ambitious of the three competing measures. *Id.* at 6-7. In contrast to H.R. 7020, S. 1480 covered "all releases of hazardous chemicals into the environment, not merely spills or discharges from abandoned waste disposal sites." 125 CONG. REC. S9173 (1979) (comments of Senator Culver, co-sponsor of S. 1480).

H.R. 85 and H.R. 7020 passed the House and were reported to the Senate. However, by the fall of 1980 it was apparent that none of the three bills would be passed. Superfund, *supra*, at xviii. Thus, on November 24, 1980, with the 96th Congress coming to an imminent close, Senators Stafford and Randolph introduced an amendment, known as the Stafford-Randolph Compromise, striking all the provisions of H.R. 7020 and inserting the compromise into the eviscerated measure. Superfund, *supra*, at xviii.

In addressing the Senate, Senator Randolph compared the new bill with H.R. 7020 and H.R. 85. He explained that H.R. 7020 was considered too narrow because it addressed only hazardous waste sites while H.R. 85, with its focus on oil spills and hazardous substances on navigable waters, was also insufficient. Senator Randolph explained:

> But let me say something that Senator Stafford and I feel strongly about. It is the scope of

22

the response provided in our amendment. We maintain that H.R. 7020 which deals only with abandoned hazardous waste sites is too narrow. We believe that coverage of spills of oil and hazardous substances into navigable water, as embodied in H.R. 85 is also not enough. The problem is bigger than the singular scope presented in each of those bills. The problem encompasses both waste sites and spills and leaks of chemicals into the environment--and that is what we must address here. We would neglect our duties to deal with only half a problem. The compromise, while greatly pared from its original version, must and does at least address the scope of the problem that this Nation faces . . . .

. . . .

While the exemptions from liability for federally permitted releases are provided to give regulated parties clarity in their legal duties and responsibilities, these exemptions are not to operate to create gaps in actions necessary to protect the public or the environment.

Accidents--whatever their cause--which result in, or can reasonably be expected to result in releases of hazardous pollutants would not be exempt from the requirements and liabilities of this bill. Thus fires, ruptures, wrecks and the like invoke the response and liability provisions of the bill.

126 CONG. REC. S14964-65 (1980).

On November 24, 1980, the Senate passed the Stafford-Randolph substitute bill and reported the measure back to the House for concurrence, where it was taken up on December 3.[12] In the House

---

[12] The legislative act of substituting S. 1480 into H.R. 7020, and then passing H.R. 7020, apparently occurred because S. 1480 contained tax provisions and, as a revenue bill, was required by the Constitution to originate in the House.

23

debate, Congressman Florio, the co-sponsor of the original version of H.R. 7020, explained how the amended bill differed from the original.  He stated:

> In this way we can get on immediately with the business of cleaning up the thousands of hazardous waste sites which dot this country and also insure that a mechanism is in place to respond to spills of dangerous substances . . . .
>
> The Senate amendments to H.R. 7020 add response authority for hazardous substances which are not hazardous wastes.

126 CONG. REC. H11787 (1980).  Additional comments made by Representative Dannemeyer, an opponent of the bill, also reflect that Congress intended H.R. 7020 to address all spills of hazardous substances:

> Admittedly, the $1.6 billion is supposed to go for chemical spills as well as hazardous waste clean up, but since the version we are about to vote on is broader than the House-passed version of the bill, it may well take the whole $1.6 billion and then some just to clean up the hazardous waste sites.

*Id.*  The House passed the substituted form of H.R. 7020 later that day, after very limited debate, and under a suspension of the rules that allowed for no amendments.  *See* Grad, *supra*, at 1 ("It was considered and passed, after very limited debate, under a suspension of the rules, in a situation which allowed for no amendments.  Faced with a complicated bill on a take it-or-leave it basis, the House took it, groaning all the way.").  President Carter signed the bill into law on December 11, 1980.  *Id.* at 35.

24

Doubtless CERCLA found its start in the publicity and concern that surrounded toxic waste sites. That theme resonated throughout the legislative process and became the moving force behind the creation of the Superfund. Nevertheless, nothing in the legislative record indicates that Congress intended to restrict CERCLA to that sole purpose. To the contrary, the legislative materials on the passage of the statute show, with reasonable clarity, that over the course of the legislative process Congress expanded the statute beyond its original underpinnings so as to address releases of hazardous substances generally, not just disposals at toxic waste sites.

### 3. Case Law

The defendants contend that this Court has acknowledged that CERCLA applies only to abandoned or inactive waste sites. In support of that argument the defendants rely primarily on our decision in *Dayton Independent School District v. U.S. Mineral Products Co.*, 906 F.2d 1059 (5th Cir. 1990). Their reliance is misplaced.

In *Dayton* this Court was presented with the narrow issue of whether CERCLA provided a remedy in asbestos-removal cases. *See Dayton*, 906 F.2d at 1064 ("Appellants urge that the district court's orders denying their motions to dismiss should be reversed or vacated because CERCLA does not provide a right of action to

recover the costs of removal of asbestos containing materials from the structure of buildings."). In addressing that question we suggested, in passing and without citation to any legislative history, that CERCLA applies only to hazardous waste sites. *Id*. at 1066. Surely that *dicta* cannot reasonably be relied upon as a definitive holding on the very significant issue of whether CERCLA liability extends beyond waste disposal sites.

The defendants also assert that we have acknowledged a waste-site limitation on other occasions. *In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 894 (5th Cir. 1993) ("[CERCLA's] purpose is to facilitate the prompt clean-up of hazardous waste sites"); *Amoco Oil Co.*, 889 F.2d at 667 ("Congress enacted CERCLA in response to well-publicized toxic waste problems"). Even the most cursory review of those cases belies the defendants' argument. Until today, this Court has never squarely addressed whether liability under CERCLA is limited to waste disposal sites. In *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568 (5th Cir. 1988), we were presented with a related question, but declined to address it. *See Tanglewood East Homeowners*, 849 F.2d at 1574 ("We are persuaded beyond peradventure that a determination of the specific businesses and activities covered by CERCLA is beyond the pale of a 12(b)(6) motion.").

26

It is true, as the defendants allege, that a handful of courts outside of this Circuit have apparently labored under the conception that CERCLA applies only to waste disposal sites. *See*, *e.g.*, *Vernon Village, Inc. v. Gottier*, 755 F. Supp. 1142, 1150-51 (D. Conn. 1990); *Electric Power Bd. of Chattanooga v. Westinghouse Elec. Corp.*, 716 F. Supp. 1069, 1080 (E.D. Tenn. 1988); *Knox v. AC & S, Inc.*, 690 F. Supp. 752, 757 (S.D. Ind. 1988). *But see*, *e.g.*, *First United Methodist Church v. United States Gypsum Co.*, 882 F.2d 862, 866 (4th Cir. 1989); *New York v. General Elec. Co.*, 592 F. Supp. 291 (N.D.N.Y. 1994). But those cases are neither binding nor persuasive.

The only such case warranting additional discussion is *Electric Power Bd. of Chattanooga*. In that case the district court broadly held that "the scope of CERCLA is limited to the release of hazardous substances in waste form only." *Electric Power Bd. of Chattanooga*, 716 F. Supp. at 1080. The district court based that conclusion in large part on a report to Congress, known as the § 301(e) Study, compiled in 1986 by a committee of twelve attorneys.[13] The quoted portion of the report is contained in its introduction, and provides:

---

[13] The purpose of the report was "to determine the adequacy of existing common law and statutory remedies in providing legal redress for harm to man and the environment caused by the release of hazardous substances into the environment." 42 U.S.C. § 9651(e)(1).

27

> Instances when hazardous substances may be released in other than waste form--i.e., the application of pesticides regulated under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA)--are expressly exempted from the enforcement provisions of [CERCLA]. Thus, the emphasis of this report, similar to the emphasis of CERCLA, is on remedying the adverse consequences of improper disposal, improper transportation, spills, and improperly maintained or closed disposal sites.

Injuries and Damages from Hazardous Wastes--Analysis and Improvement of Legal Remedies: A Report to Congress in Compliance with Section 301(e) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 by the 'Superfund Section 301(e) Study Group,' *reprinted in* Senate Committee on Environment and Public Works, Committee Print No. 97-12 pt. 1, 97th Cong., 2d Sess. 26 (1982) (footnotes omitted). We do not attach controlling significance to that quotation.

As an initial matter it is far from clear as to what significance an introductory quotation in a 1986 study group report has with regard to the actual legislative intent that attended the passage of CERCLA in 1980. More importantly, even assuming that the report may appropriately be considered legislative history, that brief quotation does not establish with any certainty that CERCLA is limited to abandoned or inactive waste sites. Indeed, one need only read a few more lines down the report to reach the following statement:

> CERCLA deals with hazardous substances at the

28

> point at which they enter the environment *in the form of spills during transportation or otherwise, or in the form of wastes*, during and after disposal. Thus, the remedies discussed in this report are legal remedies for personal injury, environmental damage and reduction of property value *resulting from the spills of hazardous substances and disposal of hazardous wastes* for which CERCLA provides cleanup and remedial activities.

*Id.* If anything, the § 301(e) Study may tend to support the conclusion that CERCLA is a broad remedial statute that covers releases of hazardous substances generally.


### 4. The EPA's Interpretation

A final issue, not raised by the parties, is whether the Environmental Protection Agency ("EPA") has interpreted CERCLA as applying to more than just waste disposal sites. It is a relevant concern because a court must defer to the EPA's reasonable construction of CERCLA absent a clearly expressed legislative purpose to the contrary. *See* **Chevron**, 467 U.S. at 842-45. As the agency charged with its administration, the EPA's interpretation of CERCLA must be followed so long as it "is based on a permissible construction of the statute," *id*. at 843, and "there are [no] compelling indications that it is wrong." **Red Lion Broad. Co. v. FCC**, 395 U.S. 367, 381 (1969).

Here, it appears that the EPA has in fact construed CERCLA as applying outside the context of waste disposal sites. In 1985 the

EPA issued an official rule adding a residential duplex in Pennsylvania to its National Priorities List for remedial action.[14] 40 C.F.R. pt. 300 (1985). The proposed rule elicited several comments contending that the addition would be inconsistent with the EPA's policy of expending funds on hazardous waste sites. The EPA disagreed, declaring that the "EPA believes that neither CERCLA nor the Hazardous Ranking System limits response to hazardous waste . . . ." 50 Fed. Reg. 37630, 37631-32 (1985). The EPA further observed that "CERCLA's authority is very broad and can extend to [household] residences."[15] *Id.* at 37632.

### 5. Conclusion

The express language of § 9607(a)(1) imposes liability on the owner or operator of a CERCLA facility without requiring a disposal. The defendants contend that the legislative intent behind the passage of CERCLA requires us to depart from the plain meaning of the statute, and infer a disposal requirement on the theory that CERCLA applies only to hazardous waste sites. Yet, nothing in the statutory scheme, the legislative history of the

---

[14] A chemist had used the building's basement for twenty years to make radium sources, and the entire structure contained hazardous levels of radiation.

[15] The EPA distinguished this case, which involved radioactive contamination of ambient atmosphere that threatened the general public, from asbestos cases which are not treated by the EPA as coming within the ambit of CERCLA liability.

statute, the implementing regulations, or the EPA's policies, supports such a crabbed reading of the statute. In fact, those several sources demonstrate, without exception, that through CERCLA Congress sought to address releases of hazardous substances generally. We therefore conclude, as did the district court, that Uniroyal successfully established that the defendants are responsible persons under § 9607(a)(1) of CERCLA.

## C. The Consumer Product Exception

The second issue for decision is whether Uniroyal successfully proved the existence of a CERCLA facility, the second prima facie element. The district court found that Uniroyal had failed to satisfy that requirement because the rupture of the tanker truck and resulting release fell within the consumer product exception, which the district court found applicable based on this Court's decision in *Dayton*. On appeal Uniroyal asserts that *Dayton* is distinguishable from the present case, which is founded on owner-operator liability under § 9607(a)(1), because *Dayton* is an asbestos removal case based on arranger-liability under § 9607(a)(3). Uniroyal further argues that under a plain reading of the exception it is impossible to conclude that a tanker truck loaded with industrial chemicals qualifies as a consumer product in consumer use. We turn to Uniroyal's first contention that the district court read *Dayton* too broadly.

31

### 1.  Our Holding in *Dayton*

In *Dayton*, the plaintiffs brought suit under CERCLA against several manufacturers and suppliers of asbestos seeking to recover the cost of removing asbestos-containing building materials from various buildings.  *Dayton*, 906 F.2d at 1061-63.  In contrast to the present case, which is founded on owner-operator liability under § 9607(a)(1), the plaintiffs in *Dayton* sued under § 9607(a)(3) CERCLA, which allows recovery against those who "arranged for disposal or treatment . . . of hazardous substances . . . at any facility . . . ."  42 U.S.C. § 9607(a)(3); *Dayton*, 906 F.2d at 1064.  The plaintiffs claimed that the defendants had "arranged for the disposal" of hazardous substances by manufacturing and selling asbestos-containing building materials.

In the resulting appeal we were asked to decide whether the district court properly denied the defendants' motions to dismiss for failure to state a claim under § 9607(a)(3) of CERCLA.  That determination rested on the narrow issue of whether CERCLA provided "a private right of action to recover the costs of removal of asbestos-containing materials from the structures of buildings." *Dayton*, 906 F.2d at 1064.  We answered the question in the negative and reversed the district court.  "Based upon the language of the statute, its legislative history, and the relevant case law, we hold that Congress did not contemplate recovery under this statute of the costs incurred to effect asbestos removal from buildings."

32

*Id.* at 1066.

That holding was based largely on the disposal requirement

contained in § 9607(a)(3).

> [The plaintiffs] undertake to turn dumping and
> disposal into building construction. We
> reject that contention . . . . [T]here is no
> possible reasonable interpretation of the term
> "disposal" that could encompass the commercial
> sale of asbestos-containing useful building
> products by the defendant manufacturers and
> suppliers. The sale of a hazardous substance
> for a purpose other than its disposal does not
> expose defendant to CERCLA liability . . . .
> The record is devoid of any substantive
> evidence that [the defendants] merely
> characterized their activities as "sales" in
> order to cloak disposal activities. Instead,
> it is clear that [the defendants] manufactured
> the asbestos-containing building materials for
> the primary purpose of creating a new useful
> and marketable product for the construction
> industry. [The defendants'] actions therefore
> cannot be considered "disposal" within the
> meaning of CERCLA.

*Id.* at 1065. However, having determined that this required element

had not been satisfied, we then proceeded to express doubt as to

whether the plaintiffs had satisfied the facility requirement in

light of the possible application of the consumer product

exception. Focusing still on the distinction between disposals and

commercial transactions, we stated:

> The provision exempting consumer products
> obviously was meant to protect from liability
> those who engage in production activities with
> a useful purpose, as opposed to those engaged
> in the disposal of hazardous substances. It
> is clear that Congress did not intend CERCLA
> to target legitimate manufacturers or sellers
> of useful products. Rather, *taken in context*,

33

> the provision reflects Congress' desire to hold liable those who would attempt to dispose of hazardous wastes or substances under various deceptive guises in order to escape liability for their disposal.
>
> The legislative history reinforces [the defendants'] argument that Congress intended to provide recovery only for releases or threatened releases from inactive and abandoned waste sites, not releases from useful consumer products in the structure of buildings. The sale of asbestos-containing products for useful consumption is not the "arranging for disposal" of a hazardous substance at a "facility," Section 107(a) of CERCLA, that the statute is designed to combat.

*Id.* at 1065-66 (emphasis added). The district court here in *Uniroyal* interpreted that language as establishing a bright-line rule that if parties are engaged in production activities with a useful purpose, as distinguished from waste disposal, then the consumer product exception operates to bar CERCLA liability. In the district court's view, *Dayton* requires a stream of commerce analysis in all CERCLA cases, even ones based on § 9607(a)(1). There are several problems with the district court's reading of *Dayton*.

In *Dayton* we faced a single, narrow issue: we were asked to determine whether CERCLA afforded a remedy in asbestos removal cases. Our holding that it did not was based squarely on the conclusion that the commercial use of asbestos could not possibly be viewed as a disposal of a hazardous substance, an express requirement under § 9607(a)(3). Although our subsequently

34

expressed concerns about the facility requirement, and the consumer product exception, added confidence to our holding, they were by no means necessary to it. *See* **Seminole Tribe v. Florida**, 517 U.S. 44, 67 (1996) (observing that court is bound by holding of a case and all portions of the opinion necessary to that result); **Kastigar v. United States**, 406 U.S. 441, 454-55 (1972) (finding that broad language of opinion which was unnecessary to court's decision could not be considered binding authority); **In re Cajun Elec. Power Coop., Inc.**, 109 F.3d 248 (5th Cir. 1997) (describing *dicta* as: "i.e., it could have been deleted without seriously impairing the analytical foundations of the holding--[and], being peripheral, *may not have received the full and careful consideration of the court that uttered it*." (quoting **Sarnoff v. American Home Prod. Corp.**, 798 F.2d 1075, 1084 (7th Cir. 1986) (emphasis added))). In that respect our language in **Dayton** regarding the consumer product exception is *dicta*.

Our comments in **Dayton** on the consumer product exception, which we expressed without citation to any specific legislative history, cannot reasonably be viewed as a definitive statement on the meaning of that exception as it relates to § 9607(a)(1). It is true, of course, that taken out of context our observations could be made to seem as if a new rule is being announced with regard to CERCLA liability generally; a rule based on a usefulness inquiry, or some form of stream of commerce analysis. But one need only

35

read *Dayton* from start to finish to see that our comments on the consumer product exception were not intended to go so far.

Our language in *Dayton* must be confined to the context in which it was written. *Dayton* is an arranger-liability case brought under § 9607(a)(3). *Dayton*, 906 F.2d at 1064. In arranger-liability cases a disposal is an express requirement for the imposition of CERCLA liability. 42 U.S.C. § 9607(a)(3); *Dayton*, 906 F.2d at 1064. Thus, in those cases it is necessary to focus on the *type of activity* that permitted hazardous substances to enter the environment. That focus is seen throughout our opinion in *Dayton*, where we continually distinguish between those who engage in useful production activities, and those who engage in the disposal of waste. *See Dayton*, 906 F.2d at 1065-66. Expectedly, that focus also colored our discussion of the consumer product exception.

Those same concerns, however, have no place in the present appeal. This action is an owner-operator claim brought under § 9607(a)(1). It imposes liability without regard to whether a disposal has occurred. Consequently, *Dayton's* focus on the disposal question, and the related distinction between useful production activities and disposals, is not germane to the question of liability in this case. In fact, if the useful product versus waste distinction in *Dayton* were made applicable to the present action, it would necessarily mean that CERCLA liability could only

36

arise in those § 9607(a)(1) cases that involved non-useful, waste products. That, however, would have the impermissible effect of adding a disposal requirement to § 9607(a)(1) that does not otherwise exist.

We conclude that our language in **Dayton** regarding the consumer product exception is limited to the facts of that case. It does not control our application of the consumer product exception in the present action.[16] As such, we next must determine whether the tanker truck or trucking terminal constitute "consumer products in consumer use." That requires us to determine the meaning of the term "consumer product."

## 2. One Latent Ambiguity

We cannot begin our inquiry into meaning of the consumer product exception until we first resolve a grammatical ambiguity hidden within § 9601(9). As a point of reference, we restate § 9601(9) as it defines facility:

> The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or

---

[16] In limiting **Dayton** to its facts, we by no means intend to suggest that our holding in **Dayton** is wrong. **Dayton** holds, correctly in our view, that CERCLA does not provide a right of recovery in asbestos removal cases. *See **Dayton***, 906 F.2d at 1061 ("We find that Congress did not intend CERCLA to cover asbestos removal cost recovery actions.").

> aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

A close reading of that provision reveals a significant question as to whether the phrase "but does not include any consumer product in consumer use or any vessel" modifies the overall definition of "facility," or whether it only modifies the preceding language in subparts (A) and, or, (B).

If the phrase is read as modifying the overall definition of facility, then the exception is limited to facilities (as defined in subparts (A) and (B)) which are themselves consumer products in consumer use. If, on the other hand, the phrase is read as modifying just the preceding subpart language, then the exception is limited to facilities (as defined in subparts (A) and (B)) which contain consumer products in consumer use. Notice that under this second interpretation the word "include," which is in the phrase "but does not include any consumer product in consumer use or any vessel," directly modifies the objects listed in subparts (A) and (B), and therefore takes on a meaning that denotes storage or containment. The facts of this case underscore this distinction and demonstrate how it affects our analysis.

Here, there are two sites that initially qualify as CERCLA facilities as defined by the subpart language. The tanker truck qualifies under subpart (A) as a motor vehicle. The trucking terminal qualifies under subpart (B) as a site or area where a

38

hazardous substance has come to be located. Under the first possible reading of § 9601(9), the critical question is whether there exists a facility which is itself a consumer product in consumer use. Thus, in our case the question would be whether the tanker truck and trucking terminal, which certainly qualify as facilities under the subpart language, constitute "consumer products in consumer use." If so, they are excepted from the definition of facility.

Conversely, under the alternative interpretation the critical question is whether there exists a facility that "includes" a consumer product in consumer use. Since the word include denotes containment under this interpretation, the question in our case would be whether the tanker truck and trucking terminal "contain" a consumer product in consumer use. Using the alternative approach our focus is on whether the VT/I-5 mixture is a consumer product in consumer use.

To our knowledge, only the Seventh Circuit and a handful of district courts have recognized this latent ambiguity. *See* **Amcast Indus. Corp. v. Detrex Corp.**, 2 F.3d 746, 750 (7th Cir. 1993) (recognizing the ambiguity and adopting the literal approach); **National R.R. Passenger Corp. v. New York City Hous. Auth.**, 819 F. Supp. 1271, 1276 (S.D.N.Y. 1993) (apparently recognizing the ambiguity and adopting the alternative approach); **Vernon Village,** 755 F. Supp. at 1151 (same); **Electrical Power Bd. of Chattanooga**,

716 F. Supp. at 1080 (same).

In the Seventh Circuit's **Amcast** case, the defendant, a chemical manufacturer, shipped a chemical solvent to the plaintiff with its own trucks, as well as those of a common carrier. After the solvent was discovered in the groundwater of an adjacent pharmaceutical facility, the plaintiff sued the defendant to recover its response costs based on evidence that both the defendant and the carrier spilled the solvent on the plaintiff's premises during the process of filling its storage tanks.

On appeal, the Seventh Circuit had occasion to construe the consumer products exception as it applied to the defendant's tanker trucks. The court rejected the claim that the exception applied to facilities that contained consumer products.

> If it is read literally, the only consumer product exempted by the statute is the consumer product that is a facility. The alternative is to read the exemption as referring to facilities that contain consumer products . . . . This [alternative] approach does excessive violence to the statutory language. The exception is for facilities that are consumer products in consumer use, not for products contained in facilities.

We agree with the Seventh Circuit's literal reading of the exception. Syntactically, the phrase "consumer product in consumer use" cannot reasonably be interpreted under the alternative, non-literal approach. This is so because the phrase does not merely exclude "any consumer product in consumer use." It excludes "any consumer product in consumer use *and any vessel*." Under the

40

alternative interpretation, § 9601(9) would thus have to be read as establishing an exclusion for buildings, equipment, pipelines, aircraft (subpart (A)), or waste disposal sites (subpart (B)), that contain a "vessel."  Given the definition of vessel,[17] that is an impossible construction.

The statute's legislative history is in accord with a literal reading of § 9601(9).  Before its final passage, S. 1480 did not contain an exclusion for consumer products in consumer use.  To remedy this perceived deficiency Senator Cannon proposed Amendment 2378, which ultimately became the consumer product exception at issue here.  A committee print summarizing the legislative history of the statute provides:

> S. 1480 defines the term "facility" broadly to include such things as "any equipment" and "any storage container," which could easily include consumer products.  Such an interpretation of this term would lead to excessive notification and liability coverage by the Act.  This amendment would explicitly clarify that *the term "facility" does not include* consumer products for the purposes of this Act.

THE ENVIRONMENT AND NATURAL RESOURCES POLICY DIVISION OF THE CONGRESSIONAL RESEARCH SERVICE OF THE LIBRARY OF CONGRESS FOR THE COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS, 97TH CONG., 2D SESS., A LEGISLATIVE HISTORY OF THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980 (SUPERFUND) 182 (Comm. Print 1983).  Thus, the legislative history of the exception

---

[17]    CERCLA defines vessel as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."  42 U.S.C. § 9601(28).

41

also indicates that the phrase "any consumer product in consumer use" was intended to qualify the overall definition of "facility," not the subpart language.

In accordance with a literal reading of § 9601(9), we find that the proper inquiry in the present appeal is whether the tanker truck and trucking terminal constitute "consumer products in consumer use."  That takes us to the final issue in this appeal, the meaning of the consumer product exception.

### 3.  The Meaning of the Consumer Product Exception

Uniroyal contends that the district court wrongly concluded that the tanker truck and trucking terminal constitute consumer products in consumer use.  It asserts that the exception cannot be interpreted in this manner without doing excessive violence to the plain meaning of the term "consumer product."  Uniroyal urges that we give the consumer product exception a definition one would ordinarily expect it to have; a definition that describes a good used for personal, family, or household use.

The phrase consumer product in consumer use is not defined anywhere in CERCLA.  Moreover, it does not appear that this Court, nor any court in the United States Court of Appeals, has authored a definitive opinion on the meaning of the consumer product exception.  Though the Seventh, Eighth, and Ninth Circuits have addressed the question in previous cases, those opinions dispose of

42

the issue in summary fashion, leaving us very few bread crumbs to follow.  *See* **Amcast**, 2 F.3d at 750-51 (concluding without explanation that a tanker truck is not a consumer product in consumer use); **Kane v. United States**, 15 F.3d 87, 89-90 (8th Cir. 1993) (concluding, based solely on our *dicta* in **Dayton**, that residential property is a consumer product in consumer use); **Blech**, 976 F.2d at 527 n.1 (concluding without explanation in a footnote that structures containing asbestos building material are not consumer products in consumer use).

The United States District Courts, on the other hand, have squarely addressed and debated the meaning of the consumer product exception.  Two separate views presently exist.  The first is that the consumer product exception applies to all substances that are considered economically useful.  *See*, *e.g.*, **Knox**, 690 F. Supp. at 756 (stating that asbestos-containing insulation, sold between businesses, could be considered a consumer product); **Electrical Power Bd. of Chattanooga**, 716, F.  Supp. at 1080 (holding that electrical transformers that leaked dialectric cooling fluid containing polychlorinated biphenyl ("PCBs") are consumer products in consumer use); **Vernon Village**, 755 F. Supp. at 1150 (holding that contaminated drinking water is a consumer product in consumer use based on the apparent reasoning that water is a useful

product).  The exception acquires considerable breadth under this approach as it precludes CERCLA liability in every case that does not involve a waste material.

The second approach purports to rely on the ordinary meaning of the term consumer product, and construes the exception as covering only products used for personal, household, or family consumption.  *See, e.g., United States v. M/V Santa Clara I*, 887 F. Supp. 825, 842 (D.S.C. 1995) (holding that consumer product exception not applicable in case where shipping containers carrying barrels of arsenic trioxide were lost from vessel in heavy seas); *KN Energy Inc. v. Rockwell Int'l Corp.*, 840 F. Supp. 95, 99 (D. Colo. 1993) (holding that pipelines sealed with substance containing PCBs were commercial facilities, not consumer products in consumer use); *Reading Co. v. City of Philadelphia*, 823 F. Supp. 1218, 1232-34 (E.D. Pa. 1993) (holding that railcars that leaked PCBs while used in commuter train service not consumer products in consumer use); *CP Holdings, Inc. v. Goldberg-Zoino & Assocs., Inc.*, 769 F. Supp. 432, 438 (D.N.H. 1991) (holding that commercial hotel built with asbestos-containing materials not consumer product in consumer use); *see also National R.R. Corp.*, 819 F. Supp. at 1276 (holding that consumer product exception not applicable in case where support pillars and building understructures were coated with asbestos-containing material).  This view permits the imposition of CERCLA liability in cases involving useful, non-waste products, so

long as there is no consumer product in consumer use under the ordinary meaning of that phrase. Thus, it does not significantly restrict the scope of CERCLA liability.

We begin, as we must, by inquiring into the plain meaning of the term consumer product. In Webster's Third New International Dictionary, the term "consumer goods," a phrase that is closely related to, if not synonymous with, "consumer products," is defined as "economic goods that directly satisfy human wants or desires."[18] Webster's Third New International Dictionary (16th ed. 1971). Black's Law Dictionary offers a consistent description. It defines a "consumer product" as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes." Black's Law Dictionary 317 (6th ed. 1990). On its face, therefore, the term consumer product refers to a good that is used by an individual for personal, family, or household purposes.

We find it significant that Congress has chosen to give the term very similar definitions in other federal statutes. In the Consumer Product Safety Act, 15 U.S.C. § 2051, et seq., for instance, the term consumer product is defined as follows:

> (1) The term "consumer product" means any article, or component part thereof, produced or distributed (i) for sale to a consumer for

---

[18] "Producer goods," by comparison, are described in Webster's as "goods that are factors in the production of other goods and that satisfy wants only indirectly." Webster's Third New International Dictionary (16th ed. 1971).

45

use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise . . . .

15 U.S.C. § 2052. Comporting definitions are found in the Fair Packaging and Labeling Act, 15 U.S.C. § 1451, *et seq.*,[19] the Magnuson-Moss Warranty--Federal Trade Commission Improvement Act, 15 U.S.C. § 2301, *et seq.*,[20] the Energy Policy and Conservation Act,

---

[19] That definition states in pertinent part:

(a) The term "consumer commodity", except as otherwise specifically provided by this subsection, means any food, drug, device, or cosmetic (as those terms are defined by the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. 301 et seq.]), and any other article, product, or commodity of any kind or class which is customarily produced or distributed for sale through retail sales agencies or instrumentalities for consumption by individuals, or use by individuals for purposes of personal care or in the performance of services ordinarily rendered within the household, and which usually is consumed or expended in the course of such consumption or use.

15 U.S.C. § 1459(a).

[20] That definition provides in pertinent part:

(1) The term "consumer product" means any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed).

46

42 U.S.C. § 6291, *et seq.*,[21] and a statute criminalizing food and drug tampering, 18 U.S.C. § 1365.[22]  Each definition shares the element of personal, family, or household use.

---

15 U.S.C. § 2301(1).

[21]    That definition provides in pertinent part:

(1) The term "consumer product" means any article (other than an automobile, as defined in section 2001(1) of Title 15) of a type--(A) which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals; without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual, except that such term includes fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, showerheads, faucets, water closets, and urinals distributed in commerce for personal or commercial use or consumption.

42 U.S.C. § 6291(1).

[22]    That definition provides in pertinent part:

(1) the term "consumer product" means--(A) any "food", "drug", "device", or "cosmetic", as those terms are respectively defined in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321); or (B) any article, product, or commodity which is customarily produced or distributed for consumption by individuals, or use by individuals for purposes of personal care or in the performance of services ordinarily rendered within the household, and which is designed to be consumed or expended in the course of such consumption or use.

18 U.S.C. § 1365(g).

47

The legislative history of the consumer product exception is not plentiful. However, the legislative history that does exist supports an ordinary interpretation of the term consumer product. Senator Cannon, who sponsored the amendment which ultimately became the consumer product exception, addressed the Senate on September 18, 1980. Expressing concern that CERCLA's sweeping language would impose liability on ordinary consumers, he stated:

> S. 1480 contains no exclusion for consumer products. Therefore, it has been suggested that this would mean that an *individual consumer* is subject to strict, joint, and several liability for a "release" from any product that contains one of the numerous hazardous substances listed on pages 24 to 28 of the Senate Environment and Public Works Committee report. While staff has been informed that such a result was not intended, the term "facility" as it is presently defined would include consumer products, and the report does not in any way clarify that this term does not include consumer products. An amendment will be offered to clarify this matter.

126 CONG. REC. S12917 (1980) (emphasis added). Senator Cannon then offered Amendment 2378, accompanied by the following statement:

> [O]ne of my amendments would exclude consumer products from the definition of 'facility,' thus precluding any unintended application of notification requirements and liability provisions to consumers.

126 CONG. REC. S13364 (1980).

That same view of the consumer product exception was expressed five years later in the legislative history of SARA, the 1986 statute that reauthorized and amended CERCLA. In considering an

48

amendment requiring the inventory of hazardous substances by owners and operators of facilities, the Senate Committee on the Environment and Public Works addressed the consumer product exception. In its report the committee observed:

> This use of the mixture rule in the definition of "hazardous substance" does not extend the coverage of this amendment to finished consumer products such as those that might be found in a retail store, where such products do not present a threat of release from a facility. This is consistent with the definition of a "facility" contained in existing section 101(9) of CERCLA, and its reference to consumer products.

S. Rep. No. 99-11, 11 (1985).

The EPA's interpretation of the consumer product exception accords with the plain meaning of the exception. In proposing a rule relating to reporting requirements for radionuclides, the EPA spoke to the meaning of the consumer product exception in the following manner:

> A number of consumer products such as watches and smoke detectors may contain (and at some point release) radionuclides. The CERCLA definition of "facility" specifically excludes any consumer product in consumer use; thus any release of radionuclides from such products when in consumer use are not subject to the notifications requirement discussed in this proposed rule.

52 Fed. Reg. 8172, 8172 n.1 (1987). Although this statement is not a complete explanation of the EPA's position on the consumer product exception, it does suggest that the EPA construes the exception as applying to goods used for individual, family, or

49

household consumption.

Other provisions in CERCLA suggest that useful products not specifically excluded from liability under the statute are necessarily included. In CERCLA, for example, the definition of release excludes "the normal application of fertilizer products." 42 U.S.C. § 9601(22). It also exempts "emissions from engine exhaust from a motor vehicle." *Id.* Hence, when Congress wanted to except from CERCLA liability a useful commercial product, or the byproduct of a useful production activity, it did so through an express exclusion.

Finally, we cannot construe consumer products to mean all useful products without frustrating the basic purposes of CERCLA. Numerous courts, including our own, have recognized that CERCLA is a broad remedial statute. *OHM Remediation Servs.*, 116 F.3d at 1578; *First United Methodist Church*, 882 F.2d at 867; *B.F. Goodrich v. Murtha*, 958 F.2d 1192, 1197 (2d Cir. 1992); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir. 1989). It has been said that through CERCLA Congress "sought to deal with every conceivable area where hazardous substances come to be located." *General Elect. Co.*, 592 F. Supp. at 296. Were we to accept the defendants' argument that the consumer product exception excludes from liability any product which is not a waste, the exception would effectively remove an entire class of environmental threats from CERCLA's reach. Any accidental explosion, spill, or

release of a useful industrial chemical would be excluded from the statute regardless of the threat posed to the public and the environment. CERCLA would effectively become nothing more than a waste dump statute. To accord CERCLA's liability provisions any meaning at all, the phrase "consumer product in consumer use" must be given its ordinary meaning.

Based on the plain language of the exception, the applicable legislative history, and the broad remedial purpose of CERCLA, we conclude that "consumer product in consumer use" means any good normally used for personal, family, or household purposes, which was being used in that manner when the subject release occurred. In accordance with that definition, we find that neither the tanker truck nor trucking terminal qualifies as a consumer product in consumer use. Therefore, because that exception does not apply, and because the tanker truck and trucking terminal plainly qualify as facilities under § 9601(9), we find that the district court erred in concluding that Uniroyal had not established this element.

## IV. CONCLUSION

Based on the foregoing, we vacate the judgment of the district court granting summary judgment to the defendants, and remand to the district court for entry of judgment in favor of Uniroyal as to CERCLA liability, and for such further proceedings as to damages as may be required.